Joe Allen **KERN**, Appellant,

v.

**STATE** of Missouri, Respondent.

No. 57053.

Supreme Court of Missouri,
En Banc.

March 11, 1974.

Joan M. Krauskopf, Columbia, for appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, for respondent.

BARDGETT, Presiding Judge.

Movant-appellant Joe Allen Kern (hereafter movant), appeals from the Circuit Court judgment denying relief sought by movant's 27.26 motion following an evidentiary hearing. The motion sought the vacation of the judgment of conviction of movant of assault with intent to kill with malice, a felony, for which he received a 25-year sentence. Notice of appeal was filed prior to January 1, 1972. This court has jurisdiction. Mo.Const.Art. V, § 31, 1945 as amended, V.A.M.S.

The judgment which movant seeks to set aside was affirmed by this court on direct appeal. See State v. Kern, 447 S.W.2d 571 (Mo.1969) for facts and opinion. Thereafter the instant motion was filed; counsel was appointed for movant and an evidentiary hearing was held. Findings of fact were entered by the trial court and relief was denied.

On November 10, 1967, between 9:00 and 9:30 a. m., one Billy Wayne Myers, an inmate of the Missouri Training Center for Men at Moberly, Mo. (hereafter M.T. C.) was stabbed in the abdomen. This took place within the prison compound between the gym and the chapel. Myers identified movant as his assailant. Movant was also an inmate of that prison on the occasion in question. At the criminal trial Myers testified that Billy Boyer, another inmate, was present and assisted movant in the stabbing and that a fourth inmate, whose name Myers did not know, but whom Myers described as a short colored fellow who was supposed to be a boxer, joined the group and was standing about five or six feet from Myers when the stabbing took place. Myers could not identify the fourth person by name, but stated that he (the fourth person) would had to have seen the stabbing. Myers did not see the unidentified witness after the stabbing. He believed he told the prison Superintendent, Mr. Haynes, about the unidentified inmate witness. Myers was the only witness who testified to the actual stabbing although another witness testified to circumstances implicating movant. Movant testified in his defense and denied the stabbing, stating he was not at the place where

the stabbing took place but was at or near the handball court. Six other inmates testified in support of movant's alibi.

Subsequent to movant's conviction movant learned that the unidentified Negro inmate who was stated by the victim, Myers, to have been the fourth person present at the stabbing was an inmate registered under the name of Tommy Nelson Brown, a Negro, 5'8" tall and a boxer and whose true name, as reflected in the records of the Department of Corrections, is Joseph Brown.

It is movant's contention that the prosecuting attorney and the officials at M.T.C. knew that this inmate was a possible eyewitness to the stabbing; that this information was withheld from movant and defense counsel; that this inmate would have testified that movant did not stab Myers and that, therefore, movant was denied due process under the U.S.Const. Amend. XIV as interpreted by the Supreme Court of the United States in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and is entitled to have this conviction set aside.

The Superintendent at M.T.C. testified at the Rule 27.26 hearing and stated that on November 14, 1967, four days after the stabbing, he wrote a letter to the Deputy Director of the Department of Corrections and sent a copy of the letter to the prosecuting attorney, who had charge of this prosecution. The letter stated, "There is a rumor that a colored inmate came to the rescue of Myers. He is Tommy Nelson Brown, 07976." The Superintendent had no recollection of and generally denied ever speaking to Tommy Nelson Brown about the matter and did not recall the source of the rumor. On or about November 14, 1967 movant was transferred from M.T.C. to the Mo. State Penitentiary, (hereafter M.S.P.) at Jefferson City. On January 22, 1968, Tommy Nelson Brown was transferred to Church Farm, a facility of the M.S.P. near Jefferson City. Sometime before the criminal trial of April 4, 1968 the Superintendent received two writs

of habeas corpus issued by the circuit court requiring the production at movant's trial of persons named therein "by whatever names they may be known . . ." One of the names appearing on the writ was Joseph Brown. The Superintendent had the records checked and produced at trial one Joseph Brown, Register No. 75527. When this Joseph Brown appeared in court, movant said that he was the wrong inmate.

The Superintendent testified that when an inmate leaves M.T.C. to either go home or to another institution, the file leaves M.T.C. except that they maintain a cardex file. This card has the inmate's photograph, his chart, and where he went. In addition, there is another card maintained that has his aliases, his name, and how he was released.

Tommy Nelson Brown (true name—Joseph Brown) No. 07976 was not produced at the trial. According to the testimony of defense counsel and movant, the reason the name Joseph Brown was listed on the writ was because movant believed that this man could, along with other inmates whose names were listed, assist in substantiating his contention that he was not at the place where the stabbing was committed during the time it was done. They testified that they had no knowledge that there was an inmate, who saw the stabbing, named Brown. Movant testified that it was some time after his conviction that he learned that an inmate known to him as Joseph Brown (registered as Tommy Nelson Brown) saw the stabbing and would testify that movant did not stab the victim. Movant's trial counsel asked the prosecutor for the names of all possible eyewitnesses and that the prosecutor did not tell him about Tommy Nelson Brown.

The prosecutor testified that he had received the letter from the Superintendent stating that there was a rumor that Tommy Nelson Brown came to the rescue of Myers. He did not interview Tommy Nelson Brown but relied upon the prison authorities to do the investigation as he had

no staff. The prosecutor remembered that he had a call from the Superintendent shortly after receiving the letter and was told that "It has already been checked out and Tommy Nelson Brown denied being anywhere near the place." The prosecutor then testified "I had no more interest in the rumor. I assumed it to be an unfounded rumor or I assumed that Tommy Nelson Brown was not willing to tell what he— that he may have seen it. As far as I was concerned, it was an item that could serve nobody any useful purpose and it dropped from my memory." He did not inform defense counsel of the contents of the letter, to his knowledge.

At the time of the stabbing there was an inmate registered as Tommy Nelson Brown, No. 07976, true name—Joseph Brown, 5'8" tall at M.T.C. He had previously been incarcerated in the Department of Corrections Algoa Reformatory under the name of Joseph Brown. It is routine to identify an inmate by the name under which convicted for the current commitment even though it is known that such is not his true name. This inmate had been received at M.T.C. under the name of Tommy Nelson Brown because that is the name under which he had been currently convicted.

The recreation director at M.T.C. testified that he knew inmate No. 07976 as Joe Brown; that he had requested of the Assistant Superintendent that Joe Brown, No. 07976, be permitted to engage in daily boxing training; that this man was addressed by others at M.T.C. as Joe Brown, and that he had never known an inmate there by the name of Tommy Nelson Brown.

The Superintendent and other prison officials testified that inmates usually hesitate to or refuse to give information that would implicate another inmate in a violation of the rules, and that this is ordinarily done by a denial of any knowledge of the incident. It would not be unusual for an inmate to respond to questions concerning a serious assault by saying "I don't know

anything about it" or "I didn't see anything."

The deposition of Tommy Nelson Brown (true name—Joseph Brown) was taken in July, 1970 and was read into evidence in the Rule 27.26 hearing. He testified that his name was Joseph Brown, a Negro; that he had been previously convicted and served time at the Department of Corrections facility at Algoa in the early 1960s as Joseph Brown; that he was subsequently convicted under the name of Tommy Nelson Brown and his inmate number was 07976; that he engaged in a boxing program while at Algoa and also while at M.T.C. later; that he was called either Brown or Joe Brown at M.T.C. but no one called him Tommy Nelson Brown or Tom Brown or Tommy Brown; that he was at M.T.C. in November, 1967 and was an eyewitness to the stabbing of Myers; that movant did not stab Myers; that he denied witnessing this stabbing to the Superintendent within a week after the stabbing and subsequently, but also within that first week, told the Assistant Superintendent that he did see the stabbing and that movant did not do it; that the Assistant Superintendent told him that he, the Assistant Superintendent, was in contact with the prosecutor and that Brown would hear from him later; that Brown mentioned this again to the Assistant Superintendent but Brown never heard any more of it prior to the conviction of movant in April, 1968. After the movant was convicted was the first time Brown ever talked to movant since the stabbing and that was at the M.S.P. in Jefferson City, at which time Brown told movant that he had seen it and that movant did not do it and he would so testify.

The Assistant Superintendent testified that he took no part in the investigation of the stabbing of Myers, or at least that he did not recall doing so, other than to perhaps forward material from the officers on to the Superintendent; that he did not remember interviewing any persons who were allegedly eyewitness to the stabbing;

that he may have interviewed somebody but he did not recall doing so; that if he had done so he would have forwarded the information to the Superintendent.

There are certain facts that are undisputed. They are that the stabbing took place within a prison compound in which all of the inmates, and therefore all witnesses, (except employees) are totally under the control of the State of Mo.; that free access to a prison or prisoners is not allowed; that the prosecuting attorney received a written communication from the Superintendent of the prison within one week of the assault that it was rumored in the prison that Tommy Nelson Brown, No. 07976, came to the defense of the victim, and therefore was a possible witness to the assault; that all investigation was done by prison personnel as the prosecutor had no staff to perform an investigation; that the defense attorney requested of the prosecutor the names of all possible witnesses; that the prosecutor did not give the defense attorney the name of Tommy Nelson Brown even though the prosecutor's file contained the information referred to supra which indicated that Tommy Nelson Brown might be an eyewitness; that Tommy Nelson Brown was an inmate at M.T.C. at the time of the assault on Myers; that Tommy Nelson Brown, in July, 1970, did give exculpatory testimony in that he stated he saw the stabbing and that movant did not stab the victim; that the prison officials and the prosecutor recognized that it is usual for an inmate to deny seeing an offense committed because inmates do not want to get involved, even though the inmate did in fact see the occurrence; that Tommy Nelson Brown's true name is Joseph Brown and the index system at M.T.C. so showed on a separate card even though the inmate had been transferred from M.T.C. on January, 1968 to M.S.P.-Church Farm near Jefferson City, Mo.; that the writ of habeas corpus which was issued from the court ordering the production of certain named inmates contained the name Joseph Brown and or-dered them produced by whatever names they may be known; that a different Joseph Brown was produced at the criminal trial in April, 1968 and the correct Joseph Brown (Tommy Nelson Brown) was not produced because the prison officials or clerks at M.T.C. did not check their full index system for names of designated inmates other than the names shown on the writ; that the testimony of Tommy Nelson Brown (true name—Joseph Brown), to the extent that it concerned the assault upon Myers and the non-participation of movant is material and relevant exculpatory evidence, and, is preserved in deposition form.

It does not appear to be disputed that movant did not know, prior to his criminal trial, that the man known to him as Joseph Brown (registered as Tommy Nelson Brown) was supposed to be an eyewitness to the assault. It appears to be accepted that the reason movant gave the name Joe Brown to his attorney to incorporate in the writ was that movant believed that he (Brown), and several others who were listed saw movant on the handball court during the time the assault took place and would support movant's alibi, but not that any one of them saw the assault. Six inmates did so testify.

In the State's closing argument the prosecutor told the jury, " * * * I would have been guilty of very improper conduct if I had withheld from the witness chair a man who I understood or even remotely believed was an eyewitness to the case. It is absolutely necessary to put on all the testimony and evidence that I have knowledge of and not to withhold any."

Movant's position is, among others, that Brady v. Maryland, 372 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) requires that this conviction be set aside because the prosecutor did not give the name of Tommy Nelson Brown to the defense counsel when requested to do so.

The court need not reach the question of whether Brady requires that the sentence and judgment be vacated as the issues in

this case are controlled by and can be decided under existing Missouri law.

In State v. Berstein, 372 S.W.2d 57 (Mo.1963) the court held that it was the right and obligation of defense counsel to fully investigate the case and to interview and examine as many as possible of the eyewitnesses to the offense. The court in *Berstein,* supra, reversed and remanded the case for a new trial because the prosecution prevented defense counsel from interviewing a witness who was being held in jail and thereafter the trial court overruled the defense motion to interview the witness.

It seems evident that the defense attorney in the instant case could not interview a witness such as Tommy Nelson Brown who was being held in prison unless the prosecution, in response to the defense request, told defense counsel that such a potential witness existed. In the circumstances of this case, where the prison officials and the prosecutor acknowledge that inmates are very reluctant to admit seeing what they actuallly saw, it was not the prerogative of the prosecutor to finally determine that the witness who was rumored to have seen the offense did not see it, and on that determination refuse to divulge the name to the defense.

Additionally, the prosecutor argued to the jury that it was his obligation to bring in all witnesses who were even remotely believed to have been an eyewitness. In State v. Thompson, 396 S.W.2d 697 (Mo. banc 1965) the court reversed and remanded for new trial a conviction of murder in the first degree because there were certain shell casings found at the scene which were determined to have come from a gun other than the defendant's gun, which shell casings were not produced in evidence, and the prosecutor argued to the jury that shell casings were not found at the scene. The court held the argument of the prosecutor grossly exaggerated the situation. The court held that the non-production *and* the argument placed defendant in a constitutionally unfair position and for that reason the judgment and sentence were vacated.

The instant case presents a situation that is a combination of State v. Berstein, supra, and State v. Thompson, supra, and additionally involves the apparent confusion with respect to the prison records and the inadvertent non-production of the inmate Joseph Brown who was registered under the alias of Tommy Nelson Brown. The court, of course, neither has nor indicates any view with respect to the credibility of Brown's testimony. Had he testified at trial that question would have been for the jury as it will be on retrial.

For the reasons stated supra the court holds that movant was placed in a constitutionally unfair position and therefore the judgment and sentence must be vacated and a new trial ordered. State v. Thompson, supra.

The judgment of the trial court denying defendant's motion to vacate is reversed for the reasons stated herein; the original judgment of conviction and sentence are vacated and set aside, and the cause is remanded to the Circuit Court of Randolph County for a new trial.

PER CURIAM:

The Division One opinion by BARDGETT, P. J., is adopted as the opinion of the Court en Banc.

MORGAN, J., concurs.

DONNELLY, C. J., concurs in separate concurring opinion filed.

SEILER, J., concurs and concurs in separate concurring opinion of DONNELLY, C. J.

FINCH, J., dissents in separate dissenting opinion filed.

HOLMAN and HENLEY, JJ., dissent and concur in separate dissenting opinion of FINCH, J.

DONNELLY, Chief Justice (concurring).

I would add a comment to the principal opinion.

In many cases, it will be quite difficult for the prosecutor to make a meaningful evaluation as to what information should be divulged to the defense. In this situation, I respectfully suggest that the prosecutor, as a prophylactic against reversible error, disclose all information about which he has a reasonable doubt. To proceed otherwise is to unnecessarily risk a finding on appellate review, as in this case, that defendant has been denied a fair trial, and due process, because the nondisclosed information might have been put to use by counsel for defendant in preparing or presenting his defense at trial.

FINCH, Judge (dissenting).

The principal opinion, relying on State v. Berstein, 372 S.W.2d 57 (Mo.1963), and State v. Thompson, 396 S.W.2d 697 (Mo. banc 1965), holds that existing Missouri law requires that we vacate the judgment of conviction of appellant and remand the case for a new trial. I disagree with that conclusion and hence dissent.

In Berstein counsel for defendant sought to interview one Barnes, an alleged accomplice of defendant, who was endorsed on the indictment as a witness and was incarcerated in the city jail. On instructions of the circuit attorney, counsel was not permitted to interview Barnes. Counsel filed a motion to strike Barnes as a witness and prevent him from testifying. The motion was overruled and Barnes testified as the principal witness on whom the state relied to make its case. On appeal this court held that appellant's counsel was entitled to interview

Barnes and that the conviction should be reversed and the case remanded by reason of the refusal to permit that interview.

In this case there was no refusal to permit appellant's counsel to interview any persons incarcerated in the prison. Counsel actually attempted to talk to Myers, the stabbed victim, but Myers wouldn't talk to him. Counsel also attempted to talk to Boyer, the other man charged with stabbing Myers, but since Boyer was under indictment, he did not want to talk to appellant's counsel. He was not prevented by prison authorities or by the state from talking to either of these men.

Appellant gave his counsel a long list of other prospective witnesses but instructed him not to attempt to interview them in advance of the trial. Appellant said it would be better that way because he already knew what they would say. Appellant and his counsel talked to these men at the time of trial before they actually took the witness stand and all of them said exactly what appellant said they would say. The rule in Berstein has no application to what occurred in this case and is not any authority for vacating the judgment of conviction herein.[1]

In Thompson the defendant had been convicted of killing a police officer after the police had been called to a shopping center to investigate suspicious activity. Police cars pursued an automobile driven by one Sammy Tucker in which the defendant Thompson was a passenger. The car was stopped and one officer approached the driver's side of the car and was shot and killed by Tucker, who subsequently was convicted therefor. Defendant Thompson was convicted of killing another officer who approached the passenger side of the automobile. Tucker was armed with a German

---

1. As mentioned in the principal opinion, counsel for appellant had a writ of habeas corpus ad testificandum ordered for Joseph Brown, for the purpose of attempting to show by him, as well as other inmates, that appellant was on the handball court at the time of the stabbing. The Joseph Brown intended was the one also known as Tommy Nelson Brown, but the subpoena did not so indicate and the wrong Joseph Brown was produced. Appellant did not complain to the court nor ask for time to get the intended Joseph Brown. The record in the case is ample to show that prison authorities acted in good faith and did not seek to prevent appellant from obtaining the witness intended.

pistol and Thompson had a Browning semi-automatic. Both used 9 millimeter shells and both ejected each shell when it was fired.

At his trial on the murder charge, Thompson testified that he never drew his gun from his waistband and never fired his gun. The guns were produced by the state but no shell casings or expended cartridges were produced. Thompson's attorney asked one of the police officers whether they had found any spent shell casings and he replied that he had not but he did not know whether others had. Subsequently, in argument to the jury, the prosecuting attorney added that he didn't know why there were no shell casings found and said he supposed it was for the same reason there weren't any casings found from Tucker's gun. He remarked that they probably were on someone's shelf somewhere, and concluded that the state had brought in all the evidence it had.

Subsequently, after his conviction had been affirmed on appeal, Thompson filed a post conviction motion under Rule 27.26, alleging numerous grounds for vacating the judgment of conviction, one of which was that the state had suppressed material evidence favorable to him and in oral argument to the jury had argued that no such evidence existed.

At the 27.26 hearing the evidence disclosed that the police had in their possession eight spent 9 millimeter shell cases found at the scene. Five were taken by the police from the Tucker automobile and three were brought in the next day by the father of one of the slain policemen. He had found two of these on one side of the highway and one on the other. All of these shells were sent to the Highway Patrol laboratory for examination. The laboratory returned them with a written report stating that all eight had been fired from the Tucker gun. This report was in possession of the police department and had been seen by the prosecuting attorney, but neither the shells nor report were produced at the trial or disclosed to counsel for appellant. Such evidence would have been some corroboration for Thompson's testimony that he had not fired his gun. This court, on appeal in the 27.26 proceeding, held that nonproduction of the shells and report, plus the argument to the jury that no shells had been found and that all the evidence had been produced, materially misled the jury and entitled appellant to have the judgment of conviction vacated.

Again, I find nothing in the factual situation we now consider which is anything like that in Thompson. There the state had physical evidence from the scene of the crime which linked the shooting to Tucker's gun but not to Thompson's. A written Highway Patrol laboratory report so advised the Cape Girardeau Police Department and through them the prosecuting attorney, yet that evidence was kept secret and the shells were not produced. Instead, the jury was told that there were no such shells. No such occurrences happened in the instant case. Here, the superintendent of the prison sent to the prosecuting attorney a copy of the letter from him to the Deputy Director of Corrections in which he stated: "There is a rumor that a colored inmate came to the rescue of Myers. He is Tommy Nelson Brown, 07976." A few days later, the superintendent called the prosecuting attorney and reported that "it has already been checked out and Tommy Nelson Brown denied being anywhere near the place." That is the total of the information which was in the possession of the prosecuting attorney. He testified, understandably, that he promptly dismissed the matter from his mind and later, when appellant's attorney requested the names of possible eyewitnesses to the stabbing, he made no mention of the rumor about Tommy Nelson Brown.

I submit that this is not a case of suppression of evidence or the names of witnesses. This is not an instance of concealment by the prosecuting attorney. He merely received a report of a *rumor* and a few days later the same person who advised of the existence of that rumor notified him

that they had checked and that the rumor was false. If the prosecuting attorney had had any reason to question the correctness of the subsequent report from the superintendent, he no doubt would have followed up and sought to talk to Brown because on the basis of the rumor that Brown came to Myers' rescue, such testimony would seem to have been helpful to the state. Instead, he took the report of the superintendent at face value and dismissed the matter as a rumor with which he need not ·be concerned and dismissed it from his mind.

Neither is there any real similarity between the argument of the prosecutor in the Thompson case and what the prosecuting attorney said in this case when the factual situations are considered. In Thompson, as mentioned, the argument indicated that no spent shell casings had been found, when in fact the police had eight of them together with a laboratory report linking them to Tucker rather than Thompson. In addition, counsel, when discussing spent shell casings, told the jury that they had produced all of the evidence the state had. In contrast, in this case, counsel's argument, only a part of which is quoted in the principal opinion, had nothing to do with an alleged fourth person who was at the scene when the stabbing occurred or whether there was in fact some person such as Tommy Nelson Brown. Rather, it related to a witness by the name of Kinder who had testified for the state and apparently had been a very poor witness. In his opening argument to the jury, the prosecuting attorney had this to say:

"Now we get down to poor little Mr. Kinder. I don't know how to explain Mr. Kinder. The only thing I can say is the State of Missouri owes you gentlemen, and the Court, and owes Mr. Kern absolute pardon and frankness. I wonder what would happen if I had not called Mr. Kinder and then at the time for request for a new trial or prior to that time or anytime five years from now while he is serving his sentence it is discovered that I had withheld an al-

leged eyewitness from the witness chair, he would have been entitled to a new trial, I would have been guilty of very improper conduct if I had withheld from the witness chair a man who I understood or even remotely believed was an eyewitness to the case. It is absolutely necessary to put on all the testimony and evidence that I have knowledge of and not to withhold any. So Mr. Kinder went on the stand, and Mr. Kinder obviously is another relatively weak personality individual. I don't doubt the fact that he told Mr. Haynes that he saw another prisoner, another member of this handball clique pick up a knife out of the ground and pass it to Boyer and Kern. I don't know whether he was telling the truth then or yesterday, obviously he was confused, but he certainly was not confused about the fact that it was Kern and Boyer who was with this third man he did not know out there between the chapel and the gym, and therefore we have at this point, a second eyewitness."

I submit that the foregoing argument is not at all comparable to what occurred in Thompson and provides no basis for vacating appellant's judgment of conviction herein.

The principal opinion relies solely on Missouri cases, but appellant's brief also cites and relies on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In my judgment, it does not apply to this situation or dictate a vacation of appellant's judgment of conviction.

In Brady petitioner was charged with murder in the first degree. He testified and admitted participating in the crime but claimed his companion did the actual killing. In summation to the jury, his counsel conceded that he was guilty of murder in the first degree and asked the jury to return a verdict without capital punishment. However, he was sentenced to death.

Prior to trial, Brady's counsel had requested the prosecution to allow him to examine extrajudicial statements made by petitioner's companion. Several such state-

ments were shown to him but the one in which the companion admitted the actual killing was withheld. After petitioner's conviction, counsel learned of that other statement.

On appeal, the Maryland Court of Appeals held that the suppression of the statement denied defendant due process and it remanded the case for a new trial on punishment only since the suppressed evidence could not have reduced the charge below murder in the first degree. That decision was affirmed on certiorari by the Supreme Court of the United States.

Again, in Brady we have actual suppression of physical evidence favorable to the defendant, namely, the statement of Brady's companion that he had done the killing. That is completely unlike the mere failure of the prosecutor in this case to report to defense counsel a prison rumor that an inmate came to the rescue of the one stabbed, which rumor subsequently was reported by the superintendent, after inquiry, to be without foundation.

I am apprehensive that a decision and rule which says that a prosecutor must keep track of rumors, especially when subsequently told by the one reporting the rumor that it is groundless and false, and must furnish that information to defense counsel on penalty of having a conviction reversed, imposes a burden on the state and on the prosecuting attorney which is unreasonable and unrealistic. I am not talking about actual concealment or suppression of evidence or witnesses, or about argument which conceals and misstates and thereby misleads the jury. I concurred in Thompson and still believe that it reaches the proper result. I am convinced, however, that it does not justify imposing a burden on a prosecuting attorney to keep track of and report to the defendant rumors of

something, particularly when they are subsequently reported to be false. I know of no case, state or federal, which places this burden on the prosecuting attorney, nor is it called for in the American Bar Association Standards relating to The Prosecution Function. Standard 3.11 thereof, relating to disclosure of evidence by the prosecutor, reads as follows:

"(a) It is unprofessional conduct for a prosecutor to fail to disclose to the defense at the earliest feasible opportunity evidence which would tend to negate the guilt of the accused or mitigate the degree of the offense or reduce the punishment.

"(b) The prosecutor should comply in good faith with discovery procedures under the applicable law.

"(c) It is unprofessional conduct for a prosecutor intentionally to avoid pursuit of evidence because he believes it will damage the prosecution's case or aid the accused."

This standard, I submit, does not impose a duty on the prosecutor to disclose false or unsubstantiated rumors on penalty of having a conviction reversed.

Finally, the trial court made extensive findings and conclusions in a memorandum which he filed. He found the facts to be such as to support his conclusion that neither the prosecuting attorney nor prison personnel suppressed or concealed evidence or witnesses and he specifically found that Tommy Nelson Brown did not inform Assistant Superintendent Baldwin or any other prison official that he witnessed the stabbing and that appellant was not the assailant. Those findings and conclusions are not clearly erroneous.

For the foregoing reasons, I dissent.