Donald L. **BEISHIR** and Eddie D. Umfress, Movants-Appellants,

v.

**STATE of Missouri, Respondent.**

No. 57828.

Supreme Court of Missouri, En Banc.

April 14, 1975.

Rehearing Denied May 12, 1975.

762

Thomas P. Rose, Jefferson City, for movants-appellants.

John C. Danforth, Atty. Gen., David Robards, Asst. Atty. Gen., Jefferson City, for respondent.

HOLMAN, Judge.

In December, 1966, movants (hereinafter referred to as defendants) were convicted of second degree murder and their punishment was fixed by the court (under the provisions of Section 556.280 V.A.M.S.) at life imprisonment. Upon appeal we affirmed. State v. Umfress, 433 S.W.2d 284 (Mo.1968). Thereafter the defendants filed a motion to vacate the judgment under Rule 27.26 V.A.M.R. The trial court held an evidentiary hearing and made findings adverse to defendants and overruled the motion. Defendants have duly appealed from that order and judgment. We affirm.

The principal questions presented on this appeal relate to an alleged interference by the prosecuting attorney in compliance with a subpoena duces tecum by Dr. Leroy Rook, a prison psychologist.

At the trial of defendants the two principal witnesses for the state were Ray Warren and Roger Turnbough who were inmates of the penitentiary. Defendants, also inmates, were charged with killing another inmate, James Hawkes. Apparently defendants' attorney desired to make an effort to impeach Warran by presenting expert evidence that he would not tell the truth. To that end a subpoena duces tecum was served on Dr. Rook ordering that he produce "all records of care and treatment of Ray Warren."

Defendant Beishir testified that on one day of the trial he was conveyed to the courthouse in the same automobile as Dr. Rook; that upon arrival Dr. Rook, who

was carrying a thick file, went into the office of the prosecuting attorney; that when Dr. Rook testified he only had two pieces of paper. An offer of proof was made that in August, 1967, this witness had a conversation with Dr. Rook who told him that before testifying he had gone into the office of the prosecuting attorney; that the prosecutor had taken some of the records out of the files and that he was concerned about the incident. An objection was sustained to that offer. This witness also testified that he knew that following the September, 1954, riots which occurred at the penitentiary, two inmates who testified for the state in subsequent prosecutions were released by commutation of the Governor.

Dr. Rook died prior to the 27.26 hearing and hence his testimony was not available.

Defendants offered the deposition of Granville Collins, an attorney and friend of Dr. Rook. Both of these men lived in Fulton, Missouri. Collins (whose testimony was admitted subject to objection) stated that Dr. Rook talked with him as a friend shortly after he had testified—"He was perturbed and upset as to whether or not he had an ethical duty to reveal certain information which . . . may have had some influence on the trial of this particular case." This witness further testified that Dr. Rook indicated that the prosecuting attorney looked at the records " . . . removed certain documents and would say, 'This has no bearing on this case,' and lay it aside; and, 'This has some bearing on this case,' . . . that in some of the letters that had been set aside —I do not know whether it was a psychological report, but there was some report there that indicated that the veracity of this particular witness was highly questionable, . . . Mr. Rook then informed me that he was put on the stand to testify; that the defense attorney asked him if he had brought certain records, he stated that he had and he turned the records over to the defense attorney; and at no time was he ever asked to produce, if there were

any, other records in his possession or in his knowledge or control concerning this particular witness, Mr. Warren. . . . I simply told Dr. Rook I felt under the circumstances if he felt that strongly about it, it would be my suggestion he contact the defense attorney."

Byron L. Kinder, the prosecuting attorney, testified that: "Dr. Rook came in my office unsolicited, my recollection is that he had the whole prison file, that which we have had here in evidence today. Now why he was carrying it rather than Harry Lauf [penitentiary records officer] I don't know. He handed me the file, I went through the file, and my best recollection is that I took from that file serial transcripts on Beishir and Umfress, Ray Eugene Warren's prison record, State's Exhibits 1 through 5 were in the files that I took as they are found in the trial transcript there. I didn't even discuss with Dr. Rook what he was going to testify to, and when he came here on the stand and started testifying I made appropriate objections and he was very upset with me after it was over. Dr. Rook was a psychologist and a little strange himself, he couldn't understand why he couldn't hazard a guess and make opinions. I kept the record rather tight in that regard and he was rather upset with me about it. * * *

"Q You have no recollection whatsoever of whether or not you extracted any documents?

"A I know that I extracted no documents from any file other than what I testified to. * * *

"Q (by Mr. Rose) Then is it your testimony, Mr. Kinder, that you know that the records that may have been subpoenaed on inmate Ray Warren which were brought to the courthouse by Dr. Rook, you know nothing about the fact that they were brought into the courtroom if that is true?

"A I haven't the slightest idea what Dr. Rook brought into the courtroom other

than the two documents. I know he had Mr. Warren's total file when he came into my office, but what he brought in that day I don't know."

The transcript of the original trial shows that Dr. Rook produced two papers. One was a letter from the Parole Board requesting a psychological evaluation of Ray Warren and the other was his report of such evaluation in response thereto. After some testimony concerning those exhibits the following occurred:

"Q (by Mr. Howe) All right. Dr. Rook, is that all you have in your department in regard—these two—in regard to this man, Ray Warren?

"A No, it is not.

"Q What else do you have?

MR. KINDER: Wait a minute. Let's approach the bench."

Thereafter a colloquy occurred between the Court and counsel concerning the admissibility of evidence of the nature defendants were attempting to offer, at the conclusion of which defendants' counsel abandoned any further effort in that regard and Dr. Rook was excused as a witness.

It was stipulated that two prisoners who testified for the state in the 1954 riot trials were released by commutation of sentences on January 13, 1956, long before expiration of their sentences; that Warren and Turnbough were released by commutation in 1968 and 1969, a considerable time before expiration of their sentences.

The trial court made findings as follows: "The court finds after considering all of the competent evidence that the prosecuting attorney did not interfere with the proper compliance of the subpoena duces tecum issued at request of movants by examining and removing portions of the personnel file of witness Warren so that movants were deprived of their right to view and inspect all of the records called for in the subpoena.

"The court further finds that the prosecuting attorney did not intentionally withhold or suppress any contents of the personnel file of inmate Warren specified in the subpoena duces tecum issued on behalf of movants knowing that the contents of the file would have weakened the state's case and aided the movants in their defense at the trial."

■ The first contention of defendants is that the court erred in making the findings above quoted. In our consideration of this point it should be stated that we do not believe the testimony of Granville Collins was admissible but it apparently was considered by the trial court and will also be considered by us ex gratia. We also are mindful that "Appellate review shall be limited to a determination of whether the findings, conclusions and judgment of the trial court are clearly erroneous." Rule 27.26(j).

■ It is obvious that when Dr. Rook went into the office of the prosecuting attorney he had more records than the subpoena called for. The evidence indicates that defendants' attorney was seeking psychological or psychiatric records of Warren. Apparently Mr. Kinder sorted out the records he thought should be produced but there is nothing to indicate that his action precluded Dr. Rook from taking all the records into the courtroom. Furthermore, as heretofore quoted, Dr. Rook in his testimony told counsel for defendants that he had other records. No doubt he would have produced these other records if counsel had pursued that line of questioning but, as stated above, counsel apparently concluded that the evidence was not admissible and abandoned his efforts in that regard.

■■ There is another reason why the action of the prosecuting attorney was not prejudicial to defendants. The records they sought would not have been admissible nor would they have led to admissible evidence. Defendants point to a report to

the Parole Board of a psychiatric examination of Warren by Dr. Guhleman. Therein it is stated that Warren's "frank openness and sincerity of approach is completely misleading." Assuming that such a statement indicates an opinion that Warren was not truthful it would not have been admissible even if Dr. Guhleman had appeared as a witness. It should be noted that defendants did not object to Warren being used as a witness because of mental incompetency but apparently were seeking to prove by psychiatric opinion that he was not worthy of belief. Expert testimony for this purpose is not permissible.

█ Defendants also say that some of the records would have shown that Warren feared that someone in the penitentiary would kill him and desired to be confined in maximum security. It is contended that such evidence would have helped defendants because they could argue that he volunteered to testify so that he would be so confined. Assuming that such evidence was admissible the failure to produce those records was not prejudicial because Warren testified in the trial that he had "turned himself in" (for protection).

Defendants have sought to raise a due process question by citing the case of Barbee v. Warden, Maryland Penitentiary, 4th Cir., 331 F.2d 842 (1964) which discusses the duty of the state to disclose exculpatory evidence to the defendant but that case would have no application to the factual situation before us.

As indicated we rule that the findings and conclusions of the trial court were not clearly erroneous.

█ Defendants contend, as a second ground for 27.26 relief, that the prosecuting attorney allowed Ray Warren and Roger Turnbough to testify at the original trial that they had not been promised special treatment in exchange for their testimony, when the prosecutor had made such promises. The testimony of the prosecutor was that he told the two witnesses he would see they were secure in their persons and not physically harmed, but that he offered nothing more. In the original trial, the witness Warren said he had been promised "only protection." Defendants maintain the witnesses were promised early release through executive commutation of their sentences. The trial court found against defendants on these claims and again we cannot say the finding was clearly erroneous.

For the foregoing reasons the judgment of the trial court denying relief under Rule 27.26 is affirmed.

DONNELLY, C. J., and MORGAN, HENLEY and FINCH, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.

BARDGETT, J., dissents and concurs in separate dissenting opinion of SEILER, J.

SEILER, Judge (dissenting).

Beishir and Umfress were convicted of the slaying of one James Hawkes. The crime occurred inside the walls of the Missouri State Penitentiary. The convictions rested on the testimony of two inmates, Ray Warren and Roger Turnbough. Without their testimony the state would not have made a submissible case against either defendant. See State v. Umfress, 433 S.W.2d 284 (Mo. banc 1968), which reports the original trial and appeal.

There were 25 persons who testified in the original trial. Of these, only four (none of whom were eye witnesses) were not convicted felons serving time in the penitentiary. The defendants maintained they were not in any way involved in the killing, that at the time it took place they were in another part of the prison, playing handball. Numerous inmates corroborated this. A prison guard who testified for the state and who was within a few feet of the deceased when he fell did not see either of the defendants anywhere

in the vicinity of the crime. As said, the only witnesses who connected defendants with the slaying were Warren and Turnbough, who testified they were together and saw the stabbing.[1]

I realize the present proceeding is an appeal from a motion to vacate under rule 27.26, that it is not to be used as a second appeal from the original convictions, and that the question of the guilt or innocence of the defendants is not before us, State v. Reese, 481 S.W.2d 497 (Mo. banc 1972). Nevertheless, in this post conviction review and our consideration of whether defendants' constitutional rights were impaired, we should keep in mind that it was of the most vital importance to the defendants that they be able to discredit the testimony of Warren and Turnbough.[2] This is the objective which defense counsel had in

mind when he caused the prison psychologist, Dr. Rook, to be served with a subpoena duces tecum to bring to court the records on the care and treatment of Warren.

The principal opinion disposes of the action of the prosecutor in withholding part of the records on the ground this was not prejudicial, because it is said the records were not admissible, nor would they have led to admissible evidence, pointing out that apparently defense counsel was seeking to prove by psychiatric opinion that Warren was not worthy of relief. The opinion states "Expert testimony for that purpose is not admissible." I must respectfully point out that this broad exclusion does not take into account the increased acceptance accorded psychiatry in recent years, and there is respectable authority holding to the contrary.[3]

1. Warren, age 34, at the time of the trial in December 1966, was serving sentences totaling 35 years, on which he had 24 years yet to go. He was released on executive commutation in April 1968. The prosecutor stated that he helped Warren obtain his release, but that it was not premised on any prior promise. Turnbough, who was serving a 5-year sentence, was released in March 1969. Obviously, there was no way the jury could consider these facts which happened later in arriving at their verdict in the Umfress-Beishir trial.

2. The usual method of impeaching the credibility of a witness by proving his bad reputation for truth and veracity in the community could not as a practical matter be used here by the defendants. The witness Warren resided in the penitentiary with other inmates. He did not reside, circulate, and mingle in a community of ordinary, law abiding, upright citizens. No such person was available to testify—only fellow inmates, who themselves were felons and whose credibility would be suspect to begin with.

3. See, e. g., United States v. Hiss, 88 F.Supp. 559 (S.D.N.Y.1950) (memorandum opinion permitting psychiatric testimony for purpose of impeaching the credibility of Whittaker Chambers in light of the importance of his testimony in the government's case against Alger Hiss, citing Wigmore on Evidence, [3rd ed. 1940] Vol. III, Secs. 924a, 932, 935, 997b, 998b and American Law Institute, Model Code of Evidence, Rules 106, 401, 409) ; "Nowadays there is a distinct and in-

teresting tendency to permit the use of expert witnesses in an effort to prove that the psychiatric makeup of the primary witnesses renders them less than fully credible. Maguire, Evidence—Common Sense and Common Law (1947), p. 74; Sinclair v. Turner, 447 F.2d 1158, 1162 (10th Cir. 1971) (stating the rule that "the fact of . . . mental abnormality either at the time of observing the facts which he reports in his testimony, or at the time of testifying, may be provable, on cross-examination or by extrinsic evidence, as bearing on credibility", where defendant attempted to show that a government witness was a psychopathic personality with schizophrenic tendencies) ; Mosley v. Commonwealth, 420 S.W.2d 679 (Ky.App.1967) (psychiatrist who had cared for the prosecutrix and sole witness in rape case would be allowed to testify that she was schizophrenic and subject to sexual fantasies; People v. Jones, 42 Cal.2d 219, 266 P.2d 38 (1954) conviction of child abuse reversed because of failure to permit psychiatrist to testify that defendant was not a sexual deviate or sexual psychopath.

Juviler, Psychiatric Opinions as to Credibility of Witnesses: A Suggested Approach, 48 Cal.L.Rev. 648 (1960); Curran, Expert Psychiatric Evidence of Personality Traits, 103 U.Pa.L.Rev. 999 (1955). See also Ballard v. Superior Court, 64 Cal.2d 159, 49 Cal.Rptr. 302, 410 P.2d 838 (1966), where it is observed the rules of competency are inadequate to exclude pathological witnesses; "Frequently, and of special import to juries, he [the psychopath] engages in pathological

Be that as it may, however, I am unable to agree that this case turns on whether or not expert testimony for such purpose is permissible. While the principal opinion twice makes mention that "apparently" this was the purpose counsel had in mind, no such statement of purpose or offer of proof to that effect by counsel appears in the record. I do not believe that we can limit consideration of defendants' claim to this assumption. Defense counsel was seeking "all records of the care and treatment of Ray Warren" and he had a right to view them. It is not for us to assume what his tactical judgments would have been with respect to their use. Once the documents were in court and marked as exhibits, he could have used them for additional cross-examination of Warren, he could have offered all or part of the records, he could have called as witnesses the persons who made them. Evidence admissible for one purpose is not excluded because inadmissible for another purpose. Louis Steinbaum Real Estate Co. v. Maltz, 247 S.W.2d 652 (Mo.1952). But none of this was possible without compliance with the subpoena duces tecum (it should be noted the state made no move to quash the subpoena, so any claim which might have been made that it could not be used for discovery was waived). It is because of what the state did in impeding the defense in its efforts that I believe these sentences must be vacated and the cases remanded for a new trial. It seems to me it is no answer to defendants' claim of interference by the prosecutor with the subpoena duces tecum to say that expert testimony that a given witness is not worthy of belief is inadmissible, as this does not meet the point.

That the prosecutor did edit the file is established conclusively; he admitted at the 27.26 hearing that the records which were produced at the hearing were the same records which Dr. Rook brought to the prosecutor's office and handed to him the morning of the second day of trial.[4] Among these records, then, were the following, all of which were among those in evidence at the 27.26 hearing:

1. A report of a clinical psychologist, Dr. Clifton W. Wolf, dated March 8, 1958 on Warren. This report related an occasion when Warren cut his wrist, requiring seven sutures to close the self-inflicted wound. Warren's explanation was that he feared for his life, that someone was going to kill him. Dr. Wolf concluded that Warren had sought confinement to the psychiatric ward as a reprieve from the other inmates. He was in the ward a period of 14 days. Dr. Wolf expressed the opinion Warren was malingering and attempting to show up badly and that he had a psychopathic tendency.

2. An inmate violation report on Warren dated June 10, 1963, stating that Warren was brought to disciplinary court that date claiming that he was too hot to stay in population, was in fear of his life, that the whole population was after him and that he would have to do the rest of his time in safekeeping.

3. The report of Dr. Henry V. Guhleman, Jr., a psychiatric consultant, of his

lying." Psychiatric Evaluation of the Mentally Abnormal Witness, 59 Yale L.J. 1324, 1330.

For instances where expert testimony that witness was a pathological falsifier was used to impeach credibility, see Miller v. State, 49 Okl.Cr. 133, 295 P. 403 (1930); State v. Wesler, 137 N.J.L. 311, 59 A.2d 834 (1948); People v. Cowles, 246 Mich. 429, 224 N.W. 387 (1929).

In fact, the orthodox practice of the common law was to admit the witness' own belief, founded on personal knowledge and observation, as to the trait of character of the individual in question. See Wigmore on Evidence (3rd ed.) Vol. III, Secs. 1980, 1982.

4. The prosecutor's testimony at the 27.26 hearing was: ". . . Dr. Rook came into my office unsolicited, my recollection is that he had the whole prison file, that which we have had here in evidence today . . . . I went through the file . . . and my best recollection is that I took from that file . . . Ray Eugene Warren's prison record . . . ."

examination of Warren made September 17, 1963. According to this report Warren told Dr. Guhleman about having been placed in B Basement for his own protection because "other fellows are out to get me", that the other inmates were organized against him and Warren saw little or no immediate opportunity to return to the general population. Dr. Guhleman's report states further: " . . . His rather apparent open frankness and appearing sincerity of approach is . . . completely misleading. This boy's appearance also perhaps adds to this general impression which he uses and plays it to the hilt . . . [I]t is almost impossible to believe what this boy says and only his actions speak for themselves . . . he is a person who thrives on trouble . . . " 5

But none of these records were brought to the witness stand by Dr. Rook. His testimony in the original trial, which is a part of the record before us, shows that all he brought to the witness stand were two documents—his own report on Warren and the letter from the Parole Board asking him to make the examination of Warren. He did not have with him the report on Warren by Dr. Guhleman, the report by Dr. Wolf, or the inmate violation report.

Defense counsel was entitled to see these reports. They expose Warren's unreliability, instability, self-serving misrepresentations, attempts to get himself placed in segregation extending over a period of years and his psychotic tendencies, supported by recorded data and medical reports. With these reports in hand defense counsel could have recalled Warren for further cross-examination which could have been highly effective. It was in the discretion of the trial court to have permitted the recalling of Warren for additional cross-examination and upon seeing these reports the court no doubt would have acceded to such request. See State v. Neal, 350 Mo. 1002, 169 S.W.2d 686, 697 (1943); State v. Hersh, 296 S.W. 433, 436 (Mo.1927); State v. Roe, 180 S.W. 881, 885 (Mo. 1915); State v. Fredericks, 136 Mo. 51, 37 S.W. 832 (1896); State v. Jones, 64 Mo. 391, 397 (1877). Or defense counsel could have called Warren as an unfriendly and hostile witness and examined him by cross-examination without vouching for his credibility, Burnam v. Chicago Great Western R. Co., 340 Mo. 25, 100 S.W.2d 858, 867 (1937), especially where defendants had no way to develop the leads suggested by the records other than by further cross-examination of Warren, Mooney v. Terminal R. Ass'n of St. Louis, 352 Mo. 245, 176 S.W.2d 605, 611 (1944). Warren was an inmate of the penitentiary in Jefferson City, where the trial was held. He was the next to last witness for the state on December 27, 1966. Dr. Rook was the first witness the next day, so the state could easily have produced Warren for recall.

The reports contain many leads which experienced defense counsel could have developed in cross-examining Warren to establish a motive for him to lie in this case, particularly with regard to his obsession to be segregated from the general inmate population.6 The Wolf report relates an

5. Similarly, the Granville Collins deposition states Dr. Rook told Collins as to Warren: "that during the course of the time that he had been an inmate in the Department of Corrections he had been known as the type of inmate who would say anything or do anything in order to curry favor, and that he was highly suspect on anything that he might have to say . . . ."

6. The importance of motive evidence was emphasized in United States v. Harris, 462 F.2d 1033 (10th Cir. 1972), where the prosecutor failed to disclose that several charges against his key witness were being dismissed in exchange for his testimony. The court stated at 1035, "Great leeway should be accorded the defense in establishing such a witness' *subjective reasons for testifying* . . . The jury should have known of this aspect of the case and fairness requires that the defense be given full opportunity to pursue and argue the matter" (emphasis supplied). For similar holdings, see State v. McClain, 498 S.W.2d 798 (Mo. banc 1973); State v. Brooks, 513 S.W.2d 168 (Mo.App. 1973).

occasion when Warren sought refuge in the psychiatric ward as result of an admittedly self-inflicted wrist laceration, saying he was fearful of his life, claiming someone was going to kill him. He was in the psychiatric ward for 14 days. The inmate violation report of June 10, 1963 quotes him as saying he was too hot to stay in population, was in fear of his life, the whole population was after him, that he would have to do the rest of his time in safekeeping. The Guhleman report of September 18, 1963 quotes him as saying he was put in B Basement at his request for his own protection because "other fellows are out to get me"; that the entire penitentiary was organized against him and he saw little or no immediate opportunity to return to the general population. He told Dr. Guhleman about his attempted self-mutilation to get him into the psychiatric ward to protect himself from the others, but then changed his story and said it was for the purpose of escaping from the fifth floor through a tunnel out of the hospital.

Warren had earlier testified that to check yourself in means, "When you are running from someone, you check yourself in and they protect you." One way for Warren to succeed in "checking in" would be to report to the guards that he saw another inmate stab James Hawkes—to "snitch" on a fellow inmate. It is common knowledge that it is dangerous for an inmate to be a "snitch." State v. Green, 470 S.W.2d 565 (Mo. banc 1971); Kern v. State, 507 S.W.2d 8 (Mo. banc 1974). In the present case, the prosecutor testified it was "common practice to kill witnesses in the prison if they are going to testify." In all probability, the only way Warren's life could be protected would be for him to be kept away from other prisoners. Thus, if defendants could show by cross-examination (or if Warren would not admit the facts then the defendants could lay the groundwork for calling the authors of the reports to contradict and impeach Warren on what he denied) that Warren had on numerous occasions attemped to manufac-

ture a situation where he would be taken out of the general population and placed in segregation or maximum security, then a motive or explanation appears as to why Warren would lie about having seen defendants stab Hawkes. While not exactly the same, the situation is similar in principle to the well established general rule that proof of commission of other offenses is competent to prove the specific crime when it tends to establish motive, intent, or a common scheme or plan, State v. Mitchell, 491 S.W.2d 292, 295 (Mo.1973).

The principal opinion states that inasmuch as Warren testified he had "turned himself in", the failure to produce the records sought which showed that Warren was actively seeking to be confined in maximum security could not have been prejudicial. It seems to me this premise assumes that all Warren had to do to accomplish his desired segregation was to ask the prison officials for it. Common sense tells us that it takes more than that for the prison officials to agree to special treatment for an inmate. If Warren could convince the prison officials he saw defendants kill the victim and that he would so testify in court, then the officials would know he would have to be segregated to survive. The important fact is not that Warren turned himself in; what is important is what Warren's motive was for convincing the prison officials he knew something that would put his life in danger. Was it because he was trying to see justice done, or was it because he was using another ruse to get back into segregation?

There is no way anyone can say with certainty what a jury would have concluded had defense counsel been able to cross-examine Warren from the records which were kept from him. At the very least, it is safe to say that counsel could have brought out facts from which the jury could have believed that Warren had a strong motive to make a false accusation against defendants and from which the jury could have entertained serious doubts as to Warren's truthfulness in general.

We cannot expect defendant to do the impossible and prove this would have resulted in an acquittal, but matters affecting the credibility of witnesses are always relevant and material, State v. Summers, 506 S. W.2d 67, 73 (Mo.App.1974), and only the jury can determine what it would do on a different body of evidence, Mesarosh v. United States, 352 U.S. 1, 12, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956). It is sufficient if the conduct of the state in keeping the evidence from the defendants thereby deprived them of valuable material. The material would have been helpful in discrediting Warren, developed by skilled counsel as it would have been, and that is sufficient for its absence to have prejudiced defendants' trial.

In my opinion, the finding of the trial court that the prosecuting attorney did not interfere with the proper compliance of the subpoena duces tecum by examining and removing portions of the Warren file so that defendants were deprived of their right to view and inspect all the records called for by the subpoena is clearly erroneous, and examination of the entire record leaves one with the definite and firm conviction that a grave mistake has been committed. Crosswhite v. State, 426 S.W. 2d 67 (Mo.1968). Neither Granville Collins, a member of the bar, nor Dr. Rook, who worked for the state, had any motive to misrepresent or manufacture testimony. When Dr. Rook told Mr. Collins that he had not obeyed the subpoena, as he had not when he did not bring with him to the witness stand the entire file on Ray Warren, he admitted facts which, had they been known to the court in the original trial, could have subjected him to contempt for noncompliance with a subpoena, Sec. 491.-

180, RSMo 1969, V.A.M.S., and he was in fact making a declaration against his own penal or pecuniary interest,[7] which is one of the exceptions to the hearsay rule, Sutter v. Easterly, 354 Mo. 282, 189 S.W.2d 284 (1945); Osborne v. Purdome, 250 S. W.2d 159 (Mo. banc 1952), so there is a strong element of testimonial trustworthiness as to what Dr. Rook told Collins.

The recollection of the prosecutor, who was in a sense defending himself and seeking to preserve his victory in the original trial, was, as he admitted, a "little fuzzy",[8] the events in question had occurred over five years before. But he was positive Dr. Rook did have the entire file when he came to the prosecutor's office and the state conceded in its brief that Dr. Rook arrived at the courthouse in possession of the proper records to comply with the subpoena. Something happened to crucial portions of the file between that time and the time Dr. Rook took the witness stand and in my opinion the overwhelming evidence is contrary to the findings of the trial court on this issue.

The principal opinion agrees that the prosecutor "sorted out the records he thought should be produced", but concludes that "there is nothing to indicate that this action precluded Dr. Rook from taking all the records into the courtroom." However, the testimony of the prosecutor was that he "took from that file" Warren's prison record as well as other documents. This testimony plus Dr. Rook's testimony that all he had with him on the stand were the two documents earlier referred to can lead only to the conclusion that the prosecutor retained the documents which he "sorted out" and "took." It is contrary to

---

7. On the pecuniary interest aspect, the record shows that the defendants instituted a civil rights action for damages against Dr. Rook, based on his failure to bring all the records on Warren with him to the witness stand as ordered by the subpoena.

8. The prosecutor testified that he took from the file state's exhibits 1–5 which the state

had put into evidence the first day of the trial; specifically these were the fingerprint cards on Beishir and Umfress, and their serial records used to establish their status as habitual criminals. Obviously these would not have been in a file pertaining to the "care and treatment of Ray Warren", thus illustrating the fuzziness of which the prosecutor spoke.

the evidence to conclude that Dr. Rook regained possession of what was taken from the file.

The principal opinion also points out that Dr. Rook testified he had other records, which it is said he no doubt would have produced on request, but that counsel apparently concluded the evidence was not admissible and abandoned further efforts. It seems to me, however, that we have no solid basis for ascribing such a conclusion to counsel, particularly when one examines the colloquy referred to in the principal opinion. As is set forth therein, defense counsel asked Dr. Rook if "these two", referring to the two papers which Dr. Rook had produced (his report and the letter from the Parole Board), were all he had in his department in regard to Warren. Dr. Rook said it was not, and then, before he could answer the next question, "What else do you have?", the prosecutor interrupted and approached the bench. What followed was this:

"[Prosecutor]: I want to object to any testimony being offered in this case as to what is in his file, or what is not in the file.[9] We don't—I don't know what this man's response is going to be,[10] and it may prejudice the jury. The competency of this witness, Mr. Warren, should have been challenged at a proper time, and that is an attempt to do what counsel has not the right to do, at this time.[11]

"And, if he continues with this line of questioning, I'm afraid—

"The Court: What is the purpose of this line of questioning?

"[Defense counsel]: Well, I would ask him if this was the complete report and apparently he has no copies.

"The Court: You have withdrawn it, so, whether or not it's a complete record or not, is not material. You haven't offered it. You have withdrawn your offer.[12]

"[Defense counsel]: All right. I think I'll desist on it."

Counsel thereupon abandoned further efforts, but I believe it was because he mistakenly concluded Dr. Rook had nothing else at hand—counsel said "apparently he has no copies"—not because he concluded the evidence he had tried to subpoena was inadmissible. It is unthinkable counsel would have abandoned such a gold mine of information on Warren had he any inkling of its existence. The fact that the records disclosed previous efforts by Warren to have himself placed in segregation by contending he was too hot to remain in the general population and that Dr. Wolf and Dr. Guhleman considered Warren a malingerer and a chronic liar would have been of great significance to defense counsel and the prosecutor could not be unaware of this. See Ashley v. Texas, 319 F.2d 80, 85 (5th Cir. 1965). Instead of disclosing that there was more in the file than the two documents which Dr. Rook brought to the stand, the prosecutor kept Dr. Rook from answering by a disarming

---

9. When the prosecutor made this objection he knew there was more in the file, but defense counsel did not, nor did the court.

10. However, the prosecutor did know that if Dr. Rook were permitted to answer the question, then what happened to the rest of the file would come out, again something which defense counsel and the court did not know.

11. This objection is not to the point, as defense counsel was attempting to lay the groundwork to impeach Warren's credibility, not challenge his competency. Defense counsel had earlier stated he was not contending Warren was incompetent to testify.

12. This has reference to counsel's having earlier offered Dr. Rook's report in evidence, but then, upon the court's asking, "For what purpose?", withdrawing it "at this time" for some further interrogation of Dr. Rook, during which Dr. Rook explained what a psychological evaluation was, what was needed to make one, where the records of psychiatric care would be kept, that if there had been a psychiatric examination a copy of the report should be in Rook's files, that Dr. Wolf was his predecessor. Then came the questions and the colloquy set forth earlier.

objection which conveyed the idea that the prosecutor knew no more about what Dr. Rook had than defense counsel.

Had defense counsel any idea that the prosecutor had sorted out the file, then, of course, counsel would have gotten to the missing documents quickly and we would not now, several years later, be trying to ascertain the facts. It is undisputed that the full contents of Dr. Rook's file and the action of the prosecutor in sorting through and removing documents therefrom were not made known to defense counsel or the court. This nondisclosure, in my opinion, constitutes a basic unfairness amounting to a denial of due process. In a criminal trial the prosecution has a duty of candor toward the defendant. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Defense counsel does not have to proceed on the suspicion that a witness employed by the state will not honor a subpoena duces tecum and that the prosecution will interfere with its execution as being the natural and expected state of affairs. This is true with respect to impeaching evidence as well. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). It is not the function of the prosecutor to decide what a witness under a subpoena duces tecum should or should not produce or be permitted to take into the courtroom. Missouri's Code of Professional Responsibility, rule 4, EC7–13 provides: "The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict . . . With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused . . ." See also State v. McClain and State v. Brooks, supra, fn. 6.

In hindsight it is easy to say that defense counsel should have insisted on an answer to his question, "What else do you have?", but as said in Barbee v. Warden, 331 F.2d 842, 846 (4th Cir. 1964), "In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel." If the prosecutor had permitted Dr. Rook to take to the witness stand everything he had brought with him to the courthouse, then there could have been no unfairness to defendants. But the way it was handled, defendants were unfairly deprived of access to evidence which went to the truthfulness and reliability of the witness Warren on whom the jury might well have based its determination of defendants' guilt or innocence. I do not believe counsel's failure to pursue the matter further under the circumstances disposes of defendants' claim that the state interfered with Dr. Rook's compliance with the subpoena duces tecum, thereby violating defendants' constitutional rights to due process in a full and fair trial.

Therefore, I respectfully dissent and would vacate the sentences and judgments of conviction and remand for a new trial as to both defendants.