**Phillip LANHAM, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2003–SC–0268–MR.

Supreme Court of Kentucky.

Aug. 25, 2005.

Donna L. Boyce, Appellate Branch Manager, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, James Havey, Assistant Attorney General, Criminal Appellate Division, Office of Attorney General, Frankfort, Counsel for Appellee.

## I. INTRODUCTION

Appellant, Philip Lanham, was convicted of murdering his wife and tampering with physical evidence of his crime. He was sentenced to life in prison. He claims that the trial court erred in allowing the jury to hear an unedited recording of his confession wherein a police officer repeatedly accused him of lying, in admitting inflammatory entries from the victim's diary, and in refusing to grant him a new trial based on prejudice stemming from the actions of the victim's family in the courtroom. Because we hold that the officer's comments were necessary to provide context for Appellant's response, and because Appellant's other claims that were preserved for our review were not prejudicial, we affirm Appellant's convictions.

## II. BACKGROUND

Appellant and his wife called 911 several times between October 5 and October 11,

2001. During the first call, Appellant claimed that his wife had mental problems and was suicidal, and he asked that an ambulance be sent to take her to the hospital. The 911 dispatcher told Appellant that he would have to pay for the ambulance if his wife refused to go to the hospital. Appellant's wife got on the phone and told the dispatcher that she wanted to go to the hospital, but that she was not sure that she was sick. The dispatcher then told Appellant that he needed to obtain a mental health warrant from the sheriff's office. Appellant declined to do so because he had no one to stay with his wife.

Several days later, Appellant's wife called 911. She stated that her husband was trying to force her out of the house. She then said she would call back and hung up the phone. The dispatcher tried to call back, got no answer, and tried to contact the state police. Appellant's wife then called 911 again, and the dispatcher told her that the sheriff's department would be sending someone to the house. Appellant's wife also said that Appellant was trying to kick down her door, that they had both been drinking all day, and that while Appellant did not have a weapon, there were loaded weapons in the house. A sheriff's deputy arrived at Appellant's house around 11:00 p.m. Both Appellant and his wife were drunk. The deputy later testified that Appellant's wife had no visible injuries and that she refused his offer to take her somewhere else or to call someone to come pick her up. There was another 911 call from Appellant's house later that night, but Appellant's wife called again and said that a sheriff's deputy need not come out to the house.

The next day, two Kentucky State Police Troopers went to Appellant's house to do a "welfare check." Appellant's wife was drunk, and Appellant was cleaning the house. Both Appellant and his wife said they were fine, and neither had any injuries.

Appellant called 911 again on the evening of October 11, 2001. He told the dispatcher that his wife had fallen asleep, that she was barely breathing, and that she looked like she had frozen to death. He also said that he thought she had hypothermia and asked that an ambulance be sent.

Two volunteer firefighters, Shannon Causey and Carl Gadd, and two state police officers, Trooper Mike Ashley and Detective Robert Stephens, responded to Appellant's call. When they entered the house, they noticed that there was blood on the carpet and that two large potted plants had been turned over. The house was warm and smelled of bleach. Appellant's wife was in bed with the blankets pulled up to her neck. She had bruises and lacerations on her face and blood on her mouth. She was not breathing and had no pulse. Appellant's wife was dead.

Appellant showed no emotion when Causey informed him that his wife was dead. Appellant asked Trooper Ashley if she had died of hypothermia. Trooper Ashley said that he did not know how she died, but that she had bruises on her head. Appellant also asked how to go about contacting someone about his wife's life insurance policy. Appellant told the troopers that his wife had gotten drunk the night before, fallen down several times, and then passed out. Appellant said that he also had gotten drunk and passed out. Appellant claimed that when he woke up on the morning of October 11, his wife was on the floor beside him. He put her in bed and cleaned the house. He claims that he decided to call 911 when he noted that she was not getting any better.

Trooper Ashley noticed that Appellant had a cut on his forehead, some small cuts on his hands, some bruises under his right

arm and on his side. Appellant's face looked somewhat yellow, but there were no noticeable bruises on it. He also had a large bruise at his collarbone, a scrape on his shin, and an injury to his left foot.

Trooper Stephen conducted a taped interview of Appellant later in the evening. During the interview, Appellant stated that he and his wife split half a case of beer on October 10. He claimed that he fell asleep on the couch and that his wife was still awake at that time. When he awoke the next morning, his wife was passed out on the floor beside him, so he moved her to the bed. Appellant initially said that he knew his wife was dead when he moved her; later he said that he thought she had been asleep. He again admitted to cleaning the house after moving his wife, but stated that he had done so because they had torn the house up while drunk. Appellant also said that his wife had fallen down repeatedly and had hit "corners" because she was so drunk. Later in the interview, Appellant claimed that his wife had frozen to death. He also claimed that he and his wife had not been fighting, and that "everything was a blackout," his memory was fuzzy, and he could not really remember what had happened.

Toxicological testing indicated that Appellant had no alcohol in his blood, but that he had taken valium. A t-shirt, which was partially burned and had a substance that appeared to be blood on it, was later found in the microwave at Appellant's house. A blood stained pillow was also found in the house. Testing showed that the blood on the carpet near the front window was similar to the victim's. Blood similar to Appellant's was found on the pillow, the couch, the carpet in the bedroom, a towel in the washing machine, and the bath mat. Tests of the substance on the t-shirt were inconclusive.

Appellant was indicted for murdering his wife and for tampering with physical evidence. At trial, the taped interview was played and excerpts of Appellant's wife's journal were read to the jury.

The medical examiner testified that an examination of the victim's body revealed a variety of external bruises and contusions. The victim also had small hemorrhages on her face, neck, and inside her lower eyelids, all of which were consistent with smothering, choking, or strangling, and hemorrhages in her scalp, her aorta, and the muscles in her neck. The medical examiner concluded that she had died from asphyxia caused by smothering or suffocation due to compression of the nose and mouth. The medical examiner also found that she had alcohol and valium in her blood.

Appellant moved for a directed verdict of acquittal, which was denied. The jury found Appellant guilty of Murder and Tampering with Physical Evidence and recommended sentences of life in prison and five years. Ten days after trial, Appellant filed a motion to set aside his sentence because the victim's family had been crying when photos of the crime scene were shown and because they had allegedly appeared in court during the sentencing phase wearing buttons with photographs of the victim on them. The trial court denied the motion. Appellant was finally sentenced to life in prison for the murder and five years, to run concurrently, for tampering with physical evidence. He appeals to this Court as a matter of right.[1]

## III. ANALYSIS

### A. Comments by Detective Stephens During Appellant's Taped Interview

1. KY. CONST. § 110(2)(b).

Appellant's first claim of error is that the trial court improperly allowed the Commonwealth to play an unedited version of his audiotaped interrogation. During the last three-fourths of the interrogation, Detective Stephens made repeated statements to Appellant about whether Appellant was telling him the truth. All told, the taped interrogation includes at least fifteen such statements by the detective, including that Appellant had "better start telling the truth," that "the only way out is to tell the truth," that Appellant was "not telling the truth," that the jury would not believe Appellant, and that Appellant was "lying."

Between and in response to the detective's comments, Appellant's story of what happened on the night his wife died shifted repeatedly. For example, Appellant first stated that he only had three beers, but then stated that he had been drunk. He claimed that when he woke up, he knew his wife was dead; but in response to the detective's comments, he then claimed that he thought his wife was asleep. As the interview progressed, Appellant gave details about what allegedly happened that night, e.g., that his wife had received the many marks and bruises on her body from falling down and running into corners because she was so drunk, yet later he claimed that everything from the evening before "was a blackout" and that everything was fuzzy. Near the end of the interview, Appellant repeated his assertion made before the interview started by stating that he thought his wife had "frozen to death." And at the end of the interview, Appellant simply stated: "I really can't remember."

When the taped statement was played to the jury, Detective Stephens's comments were left intact. The jury heard his repeated comments about Appellant's truthfulness during the interview along with Appellant's shifting, inconsistent story.

### 1. Preservation of the Issue

Before we can address the merits of Appellant's claim, we must determine if the error was properly preserved for appellate review. Before trial, Appellant's lawyer made an oral motion in limine to exclude Detective Stephens's extensive commentary. The trial court denied Appellant's motion, ruling that the comments were "just part of typical police interrogation techniques" and that they would have to be addressed in closing argument. Appellant did not object again when the prosecutor sought to play the tape at trial.

The Commonwealth claims that Appellant did not preserve this issue because he did not object to the unedited tape during trial. Appellant cites to *Tucker v. Commonwealth*,[2] where we held:

> While this Court has approved the use of motion in limine as a means of obtaining pretrial rulings concerning the admission and exclusion of evidence, we have not repealed the contemporaneous objection rule. One claiming error may not rely on a broad ruling and thereafter fail to object specifically to the matter complained of. When trial counsel is aware of an issue and fails to request appropriate relief on a timely basis, the matter will not be considered plain error for reversal on appeal.[3]

Despite the fact that KRE 103(d), which was in effect at the time *Tucker* was rendered, states that a "motion in limine re-

2. 916 S.W.2d 181 (Ky.1996).

3. *Id.* at 183 (citing *West v. Commonwealth*, 780 S.W.2d 600 (Ky.1989); *Crane v. Commonwealth*, 833 S.W.2d 813 (Ky. [August 28,] 1992)).

solved by order of record is sufficient to preserve error for appellate review," our decisions have increasingly read *Tucker*, which did not cite the recently enacted KRE 103(d), in an expansive manner.[4]

This expansive reading of *Tucker* has come under increasing criticism.[5] Such criticism is not a sufficient reason for us to overrule a nearly decade old case. However, *Tucker* also conflicts with some of our other cases that have held that a motion in limine overruled by an order of record is sufficient under KRE 103(d) to preserve an error.[6] These cases have all been rendered since the enactment of the rules of evidence, unlike the cases upon which *Tucker* is based. Also, as *Tucker's* critics have pointed out, and as a quick perusal of the rule reveals, *Tucker* and its progeny have exceeded the express language of KRE 103(d). As such, there is a clear conflict between some of our decisions and the express language of the rule and among our own cases since the introduction of the rule. This conflict has, no doubt, confused the bar and merits our reconsideration to remedy the inconsistency in our law.

Though *Tucker* is correct in that we have not repealed the contemporaneous objection rule, it is clear from the language of KRE 103(d) that the rule has, in effect, been modified. Also, as observed in The Study Committee Notes to the Kentucky Rules of Evidence, also known as the Commentary, KRE 103(d) "eliminates [the]

4. *See Garland v. Commonwealth,* 127 S.W.3d 529, 541 (Ky.2003) (holding that *Tucker* requires that the introduction of 404(b) evidence that was objected to prior to trial but not by contemporaneous objection could "be reviewed only for palpable error"); *Thomas v. Greenview Hosp., Inc.,* 127 S.W.3d 663, 675 (Ky.App.2004) (holding that an objectionable line of questioning was not preserved for appellate review though it was raised by a motion in limine).

5. *See Garland,* 127 S.W.3d at 549–52 (Keller, J., dissenting, joined by Cooper & Stumbo, JJ.); ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 110[6], at 48–49 (4th ed.2004) (noting that *Tucker*'s "interpretation of the provision ... clearly contradicts its plain language" and urging caution on practitioners until Court clarifies the rule); RICHARD H. UNDERWOOD & GLENN WEISSENBERGER, KENTUCKY EVIDENCE 2004 COURTROOM MANUAL 11 (2003) (noting also that Tucker "is in direct conflict with the language of KRE 103(d)"); Robert G. Lawson, *Evidence,* 86 KY. L.J. 775, 787–88 (1998) (Kentucky Law Survey) ("There are two ways to interpret this statement [in *Tucker*] and no easy way to choose between the two. Does the court mean that motions in limine will not preserve errors for review if based on 'general' rather than 'specific' objections? Or does it mean that such motions will not preserve errors unless a contemporaneous objection is made when the evidence is offered at trial? The second interpretation would seem to be plainly at odds with K.R.E. 103(d); the first would demand more of pretrial objections than is demanded of objections at trial. Drafters of the Kentucky Rules of Evidence sought to make it clear that motions in limine would preserve errors for appellate review. Whether or not this objective has been achieved may well depend upon what the court meant when it said 'we have not repealed the contemporaneous objection rule.' " (footnotes omitted)).

6. *Davis v. Commonwealth,* 147 S.W.3d 709, 722–23 (Ky.2004); *Prater v. Cabinet for Human Resources,* 954 S.W.2d 954, 959 (Ky. 1997); *O'Bryan v. Hedgespeth,* 892 S.W.2d 571, 574–75 (Ky.1995) (emphasizing the part of the rule that a motion in limine is sufficient to preserve the error for appellate review and ruling that proceeding after the motion is overruled in a manner inconsistent with the position taken in the motion still preserves the error for review because "[t] o construe a motion in limine as waived in present circumstances would defeat the purpose of KRE 103(d) and destroy the value of having such a rule"); *see also* ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 110[6], at 49, 49 n. 115 (4th ed.2004) (recognizing the split in this Court's holding as to the effect of KRE 103(d)).

doubt [as to whether an error has been preserved by a motion in limine] by providing that motions in limine resolved by order of record are sufficient to preserve errors for appellate review."[7] While the Commentary is not binding on this Court, it is useful in interpreting the rules.[8] More importantly, however, we cannot ignore the plain language of the rule.[9] Thus, we resolve the conflict in our case law in favor of the plain language, and to the extent that *Tucker* and its progeny may contradict the plain language of the rule, they are overruled.

This is not to say, however, that a blanket motion in limine is sufficient to preserve an error for appellate review. As *Tucker* correctly observed:

> An objection made prior to trial will not be treated in the appellate court as raising any question for review which is not strictly within the scope of the objection as made, both as to the matter objected to and as to the grounds of the objection. It must appear that the question was fairly brought to the attention of the trial court.... One claiming error may not rely on a broad ruling and thereafter fail to object specifically to the matter complained of.[10]

Our other cases have similarly limited KRE 103(d). For example, in *Davis v. Commonwealth*,[11] we noted that a motion in limine challenging "the presentation of any evidence supporting the Commonwealth's theory of the case without specifying any other reason why a particular fact should be suppressed"[12] was insufficient to preserve objection to the introduction of specific items of evidence because they were not addressed by the broad objection embodied by the motion in limine. We noted, in what amounts to an extension and clarification of the rule in *Tucker*, that:

> Usually, a motion in limine requests an advance ruling on a specific evidentiary fact, not a theory of the case requiring proof by multiple facts. Where a party specifies what evidence should be suppressed and why, the question has been "fairly brought to the attention of the trial court" and the trial court's ruling preserves the issue for appeal. In that scenario, the opponent of the evidence need not object when the same evidence is offered at trial. However, the same principle does not apply to broad, generic objections.[13]

More recently, in *Metcalf v. Commonwealth*,[14] we held that a specific motion in limine properly preserves an issue for appeal and we explained the intersection of *Davis* and *Tucker*:

> As explained in *Davis v. Commonwealth*, 147 S.W.3d 709, 722–23 (Ky. 2004), *Tucker* applies when the motion in limine is directed at a general area of inquiry, sometimes referred to as a

7. KRE 103 cmt. Subdivision (d) (1992).

8. KRE 1104; *see also Commonwealth v. Maricle*, 10 S.W.3d 117, 120 (Ky.1999) (recognizing that rules commentary, while not having the force of law, "provide ... a guide to interpretation of the rules as set forth").

9. *Cf. LaFleur v. Shoney's, Inc.*, 83 S.W.3d 474, 478 (Ky.2002) (discounting the appellant's argument about a civil rule because "it ignores the plain language of the rule"); *McDonald v. Ethics Committee of the Kentucky Judiciary*, 3 S.W.3d 740, 743 (Ky.1999) (overruling a Judicial Ethics Opinion in part because it "ignores the plain language of the rule").

10. *Tucker v. Commonwealth*, 916 S.W.2d 181, 183 (Ky.1996).

11. 147 S.W.3d 709 (Ky.2004).

12. *Id.* at 723.

13. *Id.* at 722 (footnote omitted).

14. 158 S.W.3d 740 (Ky.2005).

"class of evidence," Robert G. Lawson, The Kentucky Evidence Law Handbook, § 1.10[3][f], at 36 (4th ed. LexisNexis 2003), not a particular evidentiary fact. Appellant's motion in limine and the trial court's rulings thereon covered testimony regarding particular evidentiary facts and thus properly preserved all three of these issues for appellate review.[15]

Some commentators have noted that such a limited reading of KRE 103(d) contradicts KRE 103(a)(1)'s allowance of general objections as sufficient to preserve an error for appeal.[16] Such a reading, however, is supported by the Commentary:

> It should be noted a motion in limine would not be sufficient to preserve errors for appellate review unless it provided the trial court with the type of information which would be required to preserve errors at trial (i.e., information sufficient to satisfy the requirements of subdivision (a)—the specific ground for the objection being made and the substance of any evidence being offered).[17]

This is because of the nature of a motion in limine: it is primarily a *pretrial* tool aimed, in essence, at "heading off at the pass" the introduction of evidence. KRE 103(a)(1) allows a general contemporaneous objection during trial to preserve an error for review because it is usually clear from the context what the grounds for the objection are (and if they are not, the rule provides that the trial judge can ask for grounds). But motions in limine cannot function in this manner because they are not contemporaneous with the introduction of the evidence that they are aimed at. If motions in limine are not required to be specific, then KRE 103(d) could be turned into a catch-all, allowing the preservation of all manner of errors through the artful use of vague, broad motions in limine. This is clearly not what was intended by the rule. Thus, we reaffirm the portion of *Tucker*, as extended by *Davis* and *Metcalf*, that requires a motion in limine to specify the evidence objected to in order to preserve an error for appeal.

Under this rule, we hold that Appellant's lawyer's oral motion in limine was sufficiently detailed to preserve the issue for appeal. Appellant's lawyer specifically said:

> [O]n the defendant's taped statement that he gave to Detective Stephens at the time of the death. There [are] a couple of areas that I think should be kept out. One is that Stephens is saying to him that the jury ain't going to buy that. Another time he refers to a jury is not going to believe that. I think those parts should be omitted because here you have a detective kind of telling the jurors you shouldn't be believing this crap.

Though the detective actually made more than just a few references to whether the jury would believe Appellant and, among other things, actually accused Appellant of not telling the truth, the lawyer's request clearly conveyed what evidence she sought

15. *Id.* at 743.

16. RICHARD H. UNDERWOOD & GLENN WEISSENBERGER, KENTUCKY EVIDENCE 2004 COURTROOM MANUAL 11 (2003) (noting that *Tucker*'s insistence that the motion in limine must contain the specific objection is "odd, since a general objection is sufficient at trial under KRE 103(a)(1)"); Robert G. Lawson, *Evidence*, 86 Ky. L.J. 775, 787 (1998) (Kentucky Law Survey) (noting that a reading of KRE 103(d) to mean that "motions in limine will not preserve errors for review if based on 'general' rather than 'specific' objections... would demand more of pretrial objections than is demanded of objections at trial").

17. KRE 103 cmt. Subdivision (d) (1992).

to exclude. Furthermore, the trial court denied the motion on the record. This meets the requirements of KRE 103(d)—"[a] motion in limine resolved by order of record"—and the requirements of our case law to preserve the alleged error for appeal.

2. **Merits of Appellant's Claim**

Appellant claims that Detective Stephens's comments amount to an improper characterization of the testimony of another witness. We agree that it is generally improper for a witness to characterize the testimony of another witness as "lying" or otherwise. We have held: " 'A witness's opinion about the truth of the testimony of another witness is not permitted.... That determination is within the exclusive province of the jury.' "[18] This is also supported by KRE 608(a), which limits character-based attacks on the credibility of a witness to "evidence in the form of opinion and reputation" that refers only to the witness's "character for truthfulness or untruthfulness."[19] Whether this rule applies to non-testimonial statements made by a police officer during an interrogation of a criminal suspect as part of the overall interrogation technique, however, is a different and far more complex question.

Because this is an issue of first impression in Kentucky, our only recourse, aside from declaiming a rule out of the ether, is to look to the decisions of other states for guidance. Fortunately, the appellate courts of several states and at least one federal court have had the opportunity to address this issue or at least a variant of it.

In *State v. O'Brien,*[20] the Supreme Court of Missouri was faced with testimony by an officer about his interrogation of the defendant. The officer testified that during the interrogation, he interrupted the defendant and told him that was lying. The court noted that the issues were whether the testimony "constitute[d] impermissible 'opinion evidence' as to the ultimate question before the jury and [whether] its admission violated his right to a fair trial."[21] The court held that the testimony was not error because the officer "was not telling the jury that, in his opinion, the defendant is a liar. Rather, the witness was describing the give-and-take of his interrogation of [the defendant]."[22] The court also noted that the officer's comments were the "reason for or the cause" of any additional statements by the defendant thus giving "color as to why these additional statements or remarks [were] made."[23]

In *Commonwealth v. Kitchen,*[24] Pennsylvania's intermediate appellate court addressed whether certain comments by police officers contained in a videotape of an interrogation must be redacted. The court delineated the comments into two categories: (1) those in which the officers accused the defendant of lying by saying, for example, "you're lying" or "we know that

18. *Moss v. Commonwealth,* 949 S.W.2d 579, 583 (Ky.1997) (quoting *State v. James,* 557 A.2d 471, 473 (R.I.1989)); *cf. Stringer v. Commonwealth,* 956 S.W.2d 883, 888 (Ky. 1997) ("Generally, a witness may not vouch for the truthfulness of another witness.").

19. The version of KRE 608 in effect at the time of Appellant's trial was significantly different than the one in effect now. Nonetheless, that version of the rule also would have prohibited a witness from taking the stand and simply accusing another witness of lying.

20. 857 S.W.2d 212 (Mo.1993).

21. *Id.* at 221.

22. *Id.*

23. *Id.*

24. 730 A.2d 513 (Pa.Super.1999).

you're lying"; and (2) those in which the officers asked the defendant whether she had lied about certain facts, thus eliciting a response from the defendant. The court held that the first category of statements were inadmissible because they were "akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant ... [or] a prosecutor's personal opinion, either in argument or via witnesses from the stand, as to the guilt or innocence of a criminal defendant ....".[25] The court allowed the introduction of the second category of comments because "they were in question form, did not involve an opinion as to the truth or falsity of [the defendant's] statements or an opinion as to the guilt of [the defendant], and [the defendant] offered responses to the inquiries."[26]

In *State v. Demery,*[27] the Supreme Court of Washington also addressed the admissibility of portions of a videotaped interrogation where the officers suggested that the defendant was lying. For example, one of the officers in that case told the defendant: "[R]ight now nobody's gonna believe your story. Now you need to start tellin' the truth." When the defendant said the officer was "talkin' to me like I'm lying," the officer replied, "Cause you are."[28] The defendant claimed that when these statements were played at trial, they amounted to improper opinion evidence. The court's vote was fractured, with four claiming no error, one claiming harmless error, and four claiming reversible error. Because a majority of the justices voted not to reverse, the opinion claiming no error became the plurality opinion of the court.

The plurality opinion noted the officers' comments on the tape "were not offered during live testimony at the trial"[29] and were "part of a commonly used police interview technique, designed to see whether a defendant will change her story during the course of an interrogation."[30] As such, the plurality held that the officers' statements were not prohibited opinion testimony.[31] The plurality also noted that the purpose of introducing the statements—i.e., to show the context of the defendant's responses, not to impeach her credibility—was an important consideration and that police statements showing the context of a defendant's responses were admissible to provide context.[32] Ultimately, the court imposed a requirement that the introduction of such evidence be accompanied by a jury instruction "explaining that only the defendant's responses, and not the third party's statements, should be considered as evidence,"[33] but then noted that such a limiting instruction was unnecessary in that particular case "because the jury clearly understood from the officer's testimony that the statements were offered solely to provide context to the defendant's relevant responses."[34]

The dissent claimed that the officers' statements were impermissible opinion evidence introduced in violation of Washington's Rule of Evidence 608(a), which bars the use of opinion evidence to impeach

**25.** *Id.* at 521.

**26.** *Id.* at 522.

**27.** 144 Wash.2d 753, 30 P.3d 1278 (2001).

**28.** *Id.* at 1280 n. 1.

**29.** Id. at 1282.

**30.** *Id.*

**31.** *Id.*

**32.** *Id.* at 1283.

**33.** *Id.*

**34.** *Id.*

another witness (as opposed to the Federal Rule and our current version of the rule, which allow both opinion and reputation evidence). The dissent also noted that Rule 608(a) referred to "evidence," not testimony. Ultimately, the dissent concluded that the problem was that admission of the evidence allowed the jury to "hear[ ] the officers' opinions concerning the veracity of a witness." [35] Such evidence, the dissent reasoned, was no different than if the officers had testified in court that the defendant was lying.

The justice with the deciding vote agreed with the "dissent" that introduction of such statements was error, but he claimed that the error not prejudicial and therefore was harmless.[36] He noted that the officers' statements did "not appear to be a significant part of the [prosecution's] case." [37] He also concluded: "[W]hen the statement is considered in light of the officer's testimony at trial, it is apparent that the officer was not expressing a judgment about the defendant's veracity. Rather, he concedes that he was making the accusation merely in an effort to trick the defendant into changing his story." [38]

In *Dubria v. Smith,*[39] the Ninth Circuit Court of Appeals addressed this issue in the context of reviewing a denial of a petition for habeas corpus, specifically whether the admission of such evidence violates due process. The defendant in that case claimed that the comments and questions of the officer contained, among other things, "statements of disbelief of [the defendant's story], [and] opinions concerning [the defendant's] guilt ...." [40] Drawing on the findings of the California Supreme Court, which noted that the interview was "generally unremarkable" though "[t]here is no doubt that the officers were accusatory and suggested in a variety of ways that they did not believe [the defendant]," [41] the Ninth Circuit ruled that the interview was "quite properly described as an 'unremarkable interview' " [42] and that "[t]he questions and comments by [the officer] placed [the defendant's] answers in context, much like a prosecutor's questions at trial." [43] The court also noted that because the comments arose in the context of a pre-trial interview, "[t]hey were not the type of statements that carry any special aura of reliability [with the jury]." [44] Finally, the court noted that even if it was error to admit the tapes of the officers' statements, the trial court's *two* cautionary instructions, which informed the jury that the officers' questions and statements were to be considered only as questions and not for their truth, were sufficient to alleviate any error.[45] As such, the court ruled that the defendant's due process rights had not been violated by introduction of the officers' taped statements.

More recently, in *State v. Cordova,*[46] Idaho's intermediate appellate court addressed the same issue with an added

35. *Id.* at 1288.

36. *Id.* at 1286.

37. *Id.*

38. *Id.*

39. 224 F.3d 995 (9th Cir.2000), *cert. denied,* 531 U.S. 1148, 121 S.Ct. 1089, 148 L.Ed.2d 963 (2001).

40. *Id.* at 1001.

41. *Id.* at 1001 n. 2.

42. *Id.* at 1001.

43. *Id.*

44. *Id.* at 1002.

45. *Id.*

46. 137 Idaho 635, 51 P.3d 449 (Ct.App.2002).

twist. Like the other cases, the officers in *Cordova* told the defendant that he was lying, but one of the officers also told the defendant "that he was an expert in deception detection and that he knew the victim was telling the truth."[47] The court ruled that the "expert" officer's comments "appeared to be the comments of an expert,"[48] and because the comments were not necessary to give context to the defendant's answers, they were improperly admitted. The other comments were properly admitted because they provided context for the defendant's answers. The court also noted that the admissible comments could not be admitted for the truth of the matter asserted, thus the trial court had erred in not giving a limiting instruction. Ultimately, however, the court ruled that the admission of the officers' comments, though erroneous, was harmless in light of the large amount of evidence of the defendant's guilt.

The issue was addressed most recently by the Supreme Court of Kansas in *State v. Elnicki*.[49] The officer in that case made repeated comment to the defendant while questioning him, including:

> "[Y]ou just told me a flat-out lie."
>
> "When somebody lies, their eyes shift, did you realize that?"
>
> "You're sitting here bullshitting me."
>
> "You're weaving a web of fucking lies, man."

The court concluded that the comments violated Kansas's "well-known rule that a witness may not express an opinion on the credibility of another witness."[50] The court refused to distinguish between statements made on the witness stand and those presented in a videotape. The court also noted that context for the defendant's answers could have been provided "simply by having [the officer] testify and point out the progression of [the defendant's] various stories as the tape played—minus [the officer's] numerous negative comments on [the defendant's] credibility,"[51] and that the lack of a limiting instruction "compounded the already serious problem."[52] Nonetheless, because of various other errors in the case, including extensive commentary on the defendant's truthfulness by the prosecutor, the court ruled that it "need not determine whether the improper allowance of [the officer's] statements itself constitutes reversible error or simply harmless error"[53] and chose instead to reverse because of "cumulative trial errors [that] prevented him from receiving a fair trial . . . ."[54]

Though various courts across the country have addressed this issue, it is quite difficult to synthesize a majority rule, especially given that the evidentiary rules in these various states differ significantly.[55] We first note that even the courts that have recognized introduction of this type of evidence as error have been hesitant to consider such introduction alone to be re-

47. *Id.* at 453.

48. *Id.* at 455.

49. 279 Kan. 47, 105 P.3d 1222 (2005).

50. *Id.* at 1227.

51. *Id.* at 1229.

52. *Id.*

53. *Id.* at 1236.

54. *Id.*

55. For example, Kansas's Rules of Evidence consist of a series of statutes first enacted in the 1960s, *see* Kan. Stat. Ann. §§ 60–401 to –472, and which are not modeled after the Federal Rules of Evidence, whereas Kentucky, Idaho, and Washington have adopted versions of the Federal Rules, albeit with some changes.

versible error. Even the courts that have reversed when presented with this issue have done so because the error was multiplied by other errors.

We also note that such statements are not the sort of impeachment character contemplated by KRE 608 (both the old and new versions). "The word 'character'" used most narrowly and accurately, describes the personal disposition or personality of an individual."[56] Such comments are not an attempt to describe to the jury the defendant's personality; nor are they statements aimed at impeaching a *witness,* especially when it is unknown whether a criminal defendant will take the stand. By making such comments, the officer is not trying to convince anyone—not the defendant (who knows whether he or she is telling the truth), other officers, a prosecutor, or the jury—that the defendant was lying. Rather, such comments are part of an interrogation technique aimed at showing the defendant that the officer recognizes the holes and contradictions in the defendant's story, thus urging him or her to tell the truth.

This last point is perhaps most important, at least for the purpose of developing a rule that will address future instances of similar evidence. Almost all of the courts that have considered the issue recognize that this form of questioning is a legitimate, effective interrogation tool. And because such comments are such an integral part of the interrogation, several courts have noted that they provide a necessary context for the defendant's responses. We agree that such recorded statements by the police during an interrogation are a legitimate, even ordinary, interrogation technique, especially when a suspect's story shifts and changes. We also agree that retaining such comments in the version of the interrogation recording played for the jury is necessary to provide a context for the answers given by the suspect.

■ We also agree, however, that such comments are not admissible for the truth of the matter that they appear to assert, i.e., that the defendant is lying. We recognize that the introduction of such comments, no doubt, entails the possibility that the jury will misunderstand and accord to those comments an impermissible weight during deliberation. The solution to this problem suggested by the Kansas Supreme Court, i.e., to redact the comments from the recording and have the officer give live testimony as to how the suspect's story shifted in response to questioning, however, is unworkable. Requiring that the interrogating officer intersperse the recording with his or her explanation of the progression of the defendant's various stories could dilute the effectiveness of the playing of the recording because it would require a stop-and-go approach, thus breaking up the recording. Such a practice could also run the same risk of prejudice to the defendant in some cases. For the officer "to point out the progression of [the defendant's] various stories as the tape played," as the Kansas Supreme Court described its approach, would require the officer to say, for example, "Here the defendant changed his story." The clear implication of such a statement is that the defendant is lying with regard to at least one version of his or her story, thus such a statement is an indirect comment on whether the defendant is telling the truth. This has the same effect of leaving in the officer's statements (and further shows how necessary such com-

56. ROBERT G. LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK § 215[2], at 97 (4th ed.2004).

mentary is to give context to the defendant's statement in response).

We think the better remedy to any possible adverse inference by the jury is a limiting admonition given by the court before the playing of the recording. Our Rules of Evidence specifically provide for such an admonition.[57] Most of the other courts that have addressed this issue have endorsed limiting admonitions[58] either by approving the trial court's use of such an admonition[59] or by proposing the use of such an admonition.[60] The admonition should be phrased so as to inform the jury that the officer's comments or statements are "offered solely to provide context to the defendant's relevant responses."[61] This means, however, that a trial court's failure to give such an admonition when requested by a defendant is error, though such an error is still subject to harmless error analysis.

As such, the comments in Appellant's case, while admissible under our holding, would have been sufficient to require the giving of a limiting instruction or admonition to the jury. We need not address whether the lack of such an instruction in this case was harmless error, however, because Appellant failed to ask for such an admonition. We have previously held that where an admonishment is sufficient to cure an error and the defendant fails to ask for the admonishment, we will not review the error.[62] This may appear to contradict our interpretation of KRE

**57.** *See* KRE 105(a) ("When evidence which is admissible as to one (1) party or for one(1) purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and admonish the jury accordingly. In the absence of such a request, the admission of the evidence by the trial judge without limitation shall not be a ground for complaint on appeal, except under the palpable error rule.").

**58.** These courts tend to use the word "instruction," even when referring to an oral comment to the jury by the judge. Generally, in Kentucky, an admonition is given orally during the trial, whereas an instruction is in writing and given at the conclusion of the trial. We prefer an admonition in this case.

**59.** *Dubria v. Smith,* 224 F.3d 995, 1002 (9th Cir.2000) (approving the trial court's use of a limiting instruction). The Ninth Circuit recounted the instructions as follows.

> Any error was cured by the judge's two cautionary instructions. In response to an objection by defense counsel, the judge told the jury:
>
> Ladies and gentlemen, you should view the questions and answers in the same way that you view the question[s] and answers in the courtroom. In other words, the questions are only pertinent as they may explain what the answers themselves are. You are not to assume as true anything that [the officer] says in his questions. The questions are only pertinent as they give meaning to the answers.
>
> Later, the judge repeated to the jury:
>
> Again I want to caution you, too, you are not to consider any of the statements that [the officer] makes for the truth of the matters asserted in those statements. Those are just questions or statements in the forms—questions in the form of statements. They are not to be considered for the truth, they are only to be considered as how they may give meaning to the answers.
>
> Any impression that the jury may have had that it could consider [the officer's] statements to be true was specifically and timely corrected by the trial judge.

*Id.* (first alteration in original).

**60.** *State v. Demery,* 144 Wash.2d 753, 30 P.3d 1278, 1283 (2001) ("We note, however, that when the trial court admits third party statements to provide context to a defendant's responses, the trial court should give a limiting instruction to the jury, explaining that only the defendant's responses, and not the third party's statements, should be considered as evidence.").

**61.** *Id.*

**62.** *Graves v. Commonwealth,* 17 S.W.3d 858, 865 (Ky.2000).

103(d) above, i.e., that a motion in limine is sufficient to preserve an error for appellate review, but it conforms to the limitations on the rule that we have expressed. By failing to ask for an admonition, even after the trial court returned a ruling that Appellant thought was in error, Appellant's "objection" was incomplete. As such, an admonition was "not strictly within the scope of the objection as made... [and was not] fairly brought to the attention of the trial court...."[63] Basically, even our relaxed reading of KRE 103(d) and *Tucker* requires that a defendant still has to ask for a remedy in order to get the remedy.

We further note that our holding in this case, and the rule that it establishes, is limited to the types of comments in this case, i.e., accusations by an officer that a defendant is not telling the truth. The rule does not address the types of comments that some of the other courts have dealt with and were not present in this case. For example, the officer in this case never told Appellant, directly or indirectly, that he was an expert in lie detection. Such comments raise additional concerns that we have not addressed in this opinion, and we decline to fashion a rule to cover such circumstances without the necessity to do so.

### B. The Victim's Diary

Appellant also claims that the trial court erred in allowing the introduction of portions of the victim's diary. Appellant admits that he wanted to introduce some of the diary entries, specifically those related to the victim's drug addiction and her intent to stop taking drugs. He claims that other diary entries were improper KRE 404(b) evidence. Appellant specifically raises issue with those entries related (1) to the victim's portrayal of Appellant as a drug abuser who had her get drugs for him, (2) to Appellant's desire that the victim not see her granddaughters, (3) to the victim's hatred of Appellant, and (4) to the victim's wish that Appellant would be caught and imprisoned for some unspecified illegal activity. Appellant also claims generally that this evidence was irrelevant and prejudicial.

#### 1. Preservation

The Commonwealth again relies on *Tucker v. Commonwealth* and claims that Appellant failed to preserve any error in this regard because there was no contemporaneous objection when the evidence was introduced at trial. Appellant's lawyer, however, made a pretrial oral motion in limine regarding this evidence. As we discussed above, if such a motion is specific enough and the trial judge rules on the motion with an order on the record, then the alleged error is preserved for appellate review under KRE 103(d). The mere fact that Appellant's lawyer moved in limine to suppress some of the diary entries, however, does not alone determine whether the issue is sufficiently preserved.

The prosecutor filed a notice regarding the diary entries pursuant to KRE 404(c). The trial court held a pretrial hearing in January 2003 to address the evidence in the notice. During this hearing, Appellant's lawyer stated that she wanted to introduce some of the diary entries because they supported her theory that the victim's injuries were caused by staggering from being in withdrawal after stopping taking valium. When the court asked Appellant's lawyer if the entire diary was to come in, she stated:

> Well, I just want to let my part in. I don't know his reason for letting the

63. *Tucker v. Commonwealth*, 916 S.W.2d 181, 183 (Ky.1996).

other part in. We are now getting over to his motion, 404 motion, that he is wanting to show my client was an abuser of drugs from the diary . . . Constantly asked her to get the drugs for him, and that they would fight over it. He is wanting to put that in, but I don't know for what purpose.

The lawyers and the judge discussed some of the questionable diary entries and the possible justifications for admission of such evidence. The judge indicated that he thought they went to the victim's state of mind, and that some of the entries that the prosecutor sought to introduce overlapped with those that Appellant wanted to introduce. The judge then asked Appellant's lawyer to compare the proposed entries. After a few minutes, Appellant's lawyer stated, "Well, your Honor, I just think this is highly inflammatory," and then she pointed specifically to an entry where the victim said Appellant was not worth the price of a bullet and that she wished he would die. The judge then stated, "Well, I am inclined to allow that," and noted that the statement was not offered for the truth of the matter asserted. The following exchange then took place:

*Judge:* I am not going to foreclose you submitting some authority . . . . If you all want to submit anything else in terms of a memo or some case law on any of the offerings he is making.

*McCollough (Appellant's Lawyer):* So far a lot of these we are together on. So at this point the Court is going to allow all of it in.

*Judge:* Yes, I am going to allow the part [the prosecutor] has tendered and highlighted. I am giving you the opportunity to respond to any of these, either collectively or individually.

*McCollough:* Okay. Right now it looks like the ones that are highlighted are the ones I would want to use anyway. There is just some additional that I would want. So I guess the day of trial—

*Judge:* Well, I would rather not wait until the day of trial. If you have some things that he is not asking for, I think we need to try to address those in advance of the trial. You all may be able to work that out on your own. If you can't, then call me and we will set something up.

The judge entered a handwritten order at the end of the hearing addressing the diary and several other issues. The portion of the order dealing with the diary reads as follows:

III. Admissibility of Diary Entries

The Commonwealth has tendered certain entries shown by the highlighted copy admitted at the hearing. Those entries are admissible in that they are offered to prove the state of mind of the victim. The defendant also wants many of the same entries admitted to prove the victim's addiction and withdrawal from drugs and the physical consequences of the withdrawal. Counsel to confer about what will be admitted by agreement. Defense may renew objections on portions not agreed.

Appellant's pretrial objection at the January 2003 hearing was not sufficient to preserve this issue for review. The oral motion was neither specific enough, since it referred only generally to the diary entries, nor was it sufficiently resolved by an order of record. Appellant's lawyer's comments at the end of the hearing and the judge's order indicate that Appellant's lawyer was in agreement with the prosecutor as to what diary entries would be admissible at trial. The judge's comment at the hearing and his notation in the order that the lawyers could address other diary entries with further objection show that the issue was not resolved and that any objec-

tions should be presented again at a later time. The motion was, in effect, deferred to trial, in which event it did not preserve the claimed error.[64] As such, the oral motion at the January 2003 hearing was insufficient to preserve this issue for appellate review.

Appellant's lawyer followed the judge's order and raised the issue again by objecting to some of the diary entries in the judge's chambers on the day of trial. While in the judge's chambers, the judge asked, "And you all have agreed to put in substantial parts of the diary anyway, right?" The prosecutor replied, "Right." Appellant's lawyer did not object to this. A few minutes later, however, Appellant's lawyer stated, "Now, we have pretty much tried to agree as you suggested on the diary entries. The only objection I have—we are pretty much in agreement—one of the entries that he wants to put in is just about [how] he doesn't want me to see the girls so much anymore. I don't know what the relevance of that is." She was referring to a diary entry that reads: "March 4,2001. He can't seem to stand the girls anymore. He wants cut back the x's [times] I see them .... I gotta do something." The judge allowed the diary entry because, he noted, it illustrated an area of conflict between Appellant and the victim.

Appellant's lawyer then raised another diary entry by stating, "Another one is where she states he is going out in the car now, and I hope he gets caught and gets twenty years." The entry she was referring to reads: "May 27, 2001. I still wish that SOB would die. He's out in the car now. I hope he gets caught & put in jail for 20 years. God only knows how much I HATE HIM." The judge also allowed this entry, noting that it was like other diary entries that were to be admitted by agreement and that it would not lead to any "real prejudice."

Appellant's lawyer's objection to these two diary entries was specific enough to fall within our interpretation of KRE 103(d) above. We also note that the judge's ruling allowing the admission of the diary entries was an "order of record." The record, however, indicates that Appellant agreed as to the other diary entries. As such, we hold that only the alleged error regarding these two diary entries was preserved for our review.

### 2. Merits of Appellant's Claim

We now turn to the merits of Appellant's claim as to the two diary entries that were preserved for our review.

The diary entry relating to the victim's grandchildren was admissible. It does not appear to refer to an act; thus it does not fall within the purview of KRE 404(b). But even if we were to read it as falling under that rule, we agree with the trial judge that it is further evidence of the growing conflict between Appellant and the victim. As such, it is evidence of a motive for the crime, which makes it potentially admissible under KRE 404(b). In determining whether to admit such evidence, the trial court is still bound by KRE 403's balancing test. The diary entry related only to a portion of the overall cause of the conflict between Appellant and the victim, but it was not repetitive or cumulative because it related to an aspect of the conflict not covered by the other diary entries. Furthermore, it was not more prejudicial than probative. The trial court did not abuse its discretion in admitting this diary entry.

64. KRE 103(d) ("A motion in limine *resolved by order of record* is sufficient to preserve error for appellate review." (emphasis added)).

This leaves the entry regarding a possible crime being committed by Appellant and describing how the victim hated Appellant and wished he would die. The Commonwealth attempts to justify introduction of this entry under the rule of completeness in KRE 106. The rule of completeness, however, does not necessarily justify the introduction of diary entries.[65] Several diary entries were omitted by agreement of the parties, and there is little chance that the rest of the diary would have presented a misleading impression absent this entry.

Furthermore, the entry does not appear to fall under the exceptions to KRE 404(b). Though the entry is vague, there is little doubt that it refers to criminal activity of some sort committed by Appellant. Though the entry as a whole further illustrates the conflict between Appellant and the victim, and thus could be considered indirect evidence related to his motive, the criminal activity referenced does not appear to fall under any of the KRE 404(b) exceptions. The introduction of the entry, with its solitary and vague reference to criminal activity, however, does not appear to have been prejudicial, especially when considered in light of the other diary entries that Appellant agreed to introduce and that make reference to Appellant's illicit drug use and a growing conflict with the victim. As such, even if this diary entry was introduced improperly, it was harmless error.

## C. Victim's Family Members During Trial

Finally, Appellant raises two issues regarding the actions of several members of the victim's family during trial.

During the guilt phase, several members of the victim's family began crying when photos detailing the crime scene and the victim's injuries were introduced. Appellant's attorney objected and noted that several members of the jury had looked at the crying family members. She asked the judge to allow the family to stay in the courtroom, but asked that they be moved so that the jury could not see them, but the judge declined to do so. Appellant raised this issue again in a motion for a new trial. The victim's family members were understandably upset by the presentation of the crime scene photos, but as the trial judge recognized, the family members were "being fairly restrained under the circumstances." As such, their crying was not the sort of emotional outburst that would inflame the jury's passions, and thus it did not rise to the level of error.[66]

Appellant also claims that during the penalty phase, several members of the victim's family wore large buttons bearing a photograph of the victim with her two grandchildren. Appellant also notes that this photo is similar to one that the trial judge had previously ruled was inadmissible at trial. While no objection

65. *See Commonwealth v. Collins,* 933 S.W.2d 811, 814 (Ky.1996) ("[W]e do not feel that the use of the diary in this matter invokes the rule of completeness. The objective of that doctrine 'is to prevent a misleading impression as a result of an incomplete reproduction of a statement or document.' " (citations omitted)).

66. *Cf. Marlowe v. Commonwealth,* 709 S.W.2d 424, 430–31 (Ky.1986) (recognizing as harmless error the "many comments made by the Commonwealth during the closing argument" such as that "appellant had walked a 'demonic and satanic' trail and made other references to religion," that "he wished there were more graphic evidence such as the smell of blood and the ability to watch [the victim's wife] search for her husband," and where "[t]he prosecutor then began crying and told the jury that he represented the Commonwealth and the victims of crimes").

was made during trial to the victim's family members' wearing these buttons, Appellant now claims this issue was preserved by raising the issue in his motion for a new trial pursuant to RCr 10.02. A motion for a new trial, however, depends on evidence newly discovered after trial. That the victim's family was wearing such buttons during the penalty phase was not newly discovered evidence; the family members were in the courtroom and in the presence of Appellant and his attorney. We would add that if the wearing of the buttons were not noticeable to Appellant and his attorney, we doubt that it was noticeable by the jury. Regardless, if the wearing of such buttons was erroneous, it should have been brought to the trial judge's attention so that he could have a chance to address the issue. Because there was no contemporaneous objection at trial, this error was not preserved for our review.[67]

## IV. CONCLUSION

For the foregoing reasons, we affirm Appellant's convictions.

GRAVES, JOHNSTONE, ROACH and WINTERSHEIMER, JJ., concur.

COOPER, J., dissents by separate opinion in which LAMBERT, C.J., and SCOTT, J., join.

COOPER, Dissenting Justice.

## I. AUDIOTAPED INTERROGATION

At approximately 7:00 p.m. on October 11, 2001, the evening of the day Appellant claims to have found his wife's dead body on the floor of their residence, Appellant consented to an audiotaped interview with Detective Robert Stephens of the Kentucky State Police. Stephens played the audiotape of the interview for the jury during his direct examination. The interview lasted twenty-four minutes. The first five minutes and thirty seconds consisted of Appellant telling Stephens his version of the day's events, *viz:* He awakened that morning to find his wife dead on the floor; he placed her in the bed and cleaned up the house; the only blood he saw was coming from his wife's nose; he sustained a cut on his head when he slipped in the bathtub and struck his head on the commode; and after cleaning up the house and taking a bath, he called the police to report the death of his wife. The remaining eighteen minutes and thirty seconds of the interview consisted of Detective Stephens stating his opinion as to what actually happened, accusing Appellant of killing his wife and lying about it, and telling Appellant that no jury would believe his story. During the interrogation, Appellant never changed his story or agreed with Stephens's repeated allegations that he had killed his wife and was lying about it. At

67. *Tamme v. Commonwealth,* 973 S.W.2d 13, 26 (Ky.1998) (noting no preservation of error regarding activities such as allowing members of the victim's family to re-enter the courtroom when jury was having testimony replayed because "[t]here were no contemporaneous objections to any of these occurrences"); *see also State v. Braxton,* 344 N.C. 702, 477 S.E.2d 172, 177 (1996) (noting that while defendant moved for a mistrial based on presence of audience members wearing victim buttons, there was insufficient reason to reverse because "[t]here are no facts in the record showing the number and identity of the spectators wearing the buttons, the identity of the person shown in the photograph, and whether the jury even noticed the buttons"); *United States v. Sheffey,* 57 F.3d 1419 (6th Cir.1995) (noting that while the presence in the courtroom of anti-drunk driving activists wearing buttons in support of their cause during a murder trial where defendant is accused of having killed victim while driving under the influence was worrisome, reversal was not merited because the defendant "did not bring to the district court's attention his current objections").

his trial, Appellant objected to playing the tape without redacting Stephens's accusations that he was lying and that no jury would believe him.

No witness, lay or expert, may express an opinion as to the truth or falsity of the testimony of another witness.

> A witness's opinion about the truth of the testimony of another witness is not permitted. Neither expert nor lay witnesses may testify that another witness or a defendant is lying or faking. That determination is within the exclusive province of the jury.

*Moss v. Commonwealth,* 949 S.W.2d 579, 583 (Ky.1997) (quoting *State v. James,* 557 A.2d 471, 473 (R.I.1989)). This proposition is almost universally accepted.[1] If Detective Stephens could not have expressed an opinion under oath that Appellant was lying and could not have advised the jury from the witness stand that they should not believe Appellant's version of the events, then he certainly could not convey that same information by way of an un-

1. *See United States v. Adams,* 271 F.3d 1236, 1245 (10th Cir.2001); *United States v. Beasley,* 72 F.3d 1518, 1528 (11th Cir.1996); *United States v. Shay,* 57 F.3d 126, 131 (1st Cir. 1995) (expert's opinion that another witness is lying or telling the truth is ordinarily inadmissible because opinion exceeds scope of expert's knowledge and merely informs the jury that it should reach a particular conclusion); *Bachman v. Leapley,* 953 F.2d 440, 441 (8th Cir.1992); *United States v. Benson,* 941 F.2d 598, 604 (7th Cir.1991) ("jury does not need an expert to tell it whom to believe"), *as modified by United States v. Hall,* 93 F.3d 1337, 1343–45 (7th Cir.1996) (evidence of psychiatric disorder that causes persons to make false confessions); *United States v. Ravel,* 930 F.2d 721, 726 (9th Cir.1991) (expert testimony inappropriate to bolster defendant's credibility); *United States v. Scop,* 846 F.2d 135, 142 (2d Cir.1988); *State v. Lindsey,* 149 Ariz. 472, 720 P.2d 73, 75–76 (1986); *Hinkston v. State,* 340 Ark. 530, 10 S.W.3d 906, 910 (2000); *People v. Coffman,* 34 Cal.4th 1, 17 Cal.Rptr.3d 710, 96 P.3d 30, 93 (2004); *People v. Koon,* 713 P.2d 410, 412 (Colo.Ct. App.1985); *State v. Porter,* 241 Conn. 57, 698 A.2d 739, 769 (1997) (excluding polygraph evidence); *Tingle v. State,* 536 So.2d 202, 204–05 (Fla.1988); *State v. Oliver,* 188 Ga. App. 47, 372 S.E.2d 256, 260 (1988); *People v. Williams,* 332 Ill.App.3d 693, 266 Ill.Dec. 168, 773 N.E.2d 1238, 1242–43 (2002); *Shepherd v. State,* 538 N.E.2d 242, 243 (Ind.1989); *State v. Myers,* 382 N.W.2d 91, 95 (Iowa 1986); *State v. Jackson,* 239 Kan. 463, 721 P.2d 232, 238 (1986), *abrogated on other grounds as recognized by State v. Rome,* 269 Kan. 47, 5 P.3d 515, 519 (2000); *State v. Foret,* 628 So.2d 1116, 1127–29 (La.1993); *Bohnert v. State,* 312 Md. 266, 539 A.2d 657, 662 (1988) (error to allow witness to express statement, belief, or opinion that another witness is telling the truth or lying); *Commonwealth v. Ianello,* 401 Mass. 197, 515 N.E.2d 1181, 1184–85 (1987); *People v. Smith,* 158 Mich.App. 220, 405 N.W.2d 156, 161 (1987); *Beishir v. State,* 522 S.W.2d 761, 764–65 (Mo. 1975) ("Assuming that such a statement indicates an opinion that Warren was not truthful it would not have been admissible even if Dr. Guhleman had appeared as a witness."); *State v. Brodniak,* 221 Mont. 212, 718 P.2d 322, 329 (1986); *State v. Jamerson,* 153 N.J. 318, 708 A.2d 1183, 1195 (1998); *State v. Kim,* 318 N.C. 614, 350 S.E.2d 347, 350–51 (1986); *State v. Willard,* 144 Ohio App.3d 767, 761 N.E.2d 688, 693 (2001) ("[T]he effect of the statement was to bolster the complainant's version by suggesting that social workers and detectives, trained to investigate cases of abuse, believed the witness. No such testimony was presented, nor would it be proper for such a witness to render an opinion whether a victim was being truthful as to claims of sexual abuse."); *State v. Milbradt,* 305 Or. 621, 756 P.2d 620, 624 (1988); *Commonwealth v. Davis,* 518 Pa. 77, 541 A.2d 315, 317 (1988); *State v. Corey,* 624 N.W.2d 841, 845 (S.D.2001); *Heidelberg v. State,* 36 S.W.3d 668, 676 (Tex. App.-Houston [14th Dist.] 2001); *Pritchett v. Commonwealth,* 263 Va. 182, 557 S.E.2d 205, 208 (2002); *State v. Romero,* 147 Wis.2d 264, 432 N.W.2d 899, 904–05 (1988); *McCone v. State,* 866 P.2d 740, 751 (Wyo.1993) ("[W]itness credibility 'is the exclusive province of the jury'; and neither expert nor lay witnesses should be permitted to testify that another witness is or is not telling the truth.").

sworn hearsay statement. I would also note, although the issue is not preserved for review, that it was error to permit the jury to hear Stephens express his opinion that Appellant was guilty of killing his wife. *Stringer v. Commonwealth,* 956 S.W.2d 883, 889–90 (Ky.1997) ("[J]urors do not need assistance in the form of an expert's opinion that the defendant is guilty or not guilty."). For a sample of cases holding that it is reversible error to permit a police officer to express an opinion that the defendant is guilty, *see State v. Steadman,* 253 Kan. 297, 855 P.2d 919, 924 (1993); *State v. Wheeler,* 416 So.2d 78, 81 (La.1982); *State v. Hogetvedt,* 623 N.W.2d 909, 915–16 (Minn.Ct.App.2001); *Boyde v. State,* 513 S.W.2d 588, 589–90 (Tex.Crim. App.1974); *State v. Barr,* 123 Wash.App. 373, 98 P.3d 518, 523–24 (2004) (trial court committed "manifest error" [Washington's equivalent of palpable error] by permitting police officer to render opinion that defendant was guilty).

Yet, the majority holds it was proper for Stephens to play for the jury an audiotape of his interrogation of Appellant in which Stephens repeatedly opined that Appellant was guilty, that Appellant was lying, and that no jury would believe him. I agree with the Supreme Court of Kansas that permitting the jury to hear the audiotape is no different than permitting the witness to render the same inadmissible opinions from the witness stand. *State v. Elnicki,* 279 Kan. 47, 105 P.3d 1222, 1229 (2005). *See also Commonwealth v. Kitchen,* 730 A.2d 513, 521–22 (Pa.Super.Ct.1999); *State v. Jones,* 117 Wash.App. 89, 68 P.3d 1153, 1155 (2003) ("We find no meaningful difference between allowing an officer to testify directly that he does not believe the defendant and allowing the officer to testify that he told the defendant during questioning that he did not believe him. In either case, the jury learns the police officer's opinion about the defendant's credibility.").

*Dubria v. Smith,* 224 F.3d 995 (9th Cir. 2000), upon which the majority opinion primarily relies, was a federal habeas review of a state court conviction in which "[f]ederal habeas corpus relief does not lie for errors of state law," *id.* at 1001 (quoting *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991)), unless they are of constitutional magnitude. *Id.* Thus, the Ninth Circuit Court of Appeals reviewed the admission of the unredacted tape only for a violation of the Due Process Clause, *i.e.,* whether its admission "so fatally infected the proceedings as to render them fundamentally unfair." *Id.* (quoting *Jammal v. Van de Kamp,* 926 F.2d 918, 919 (9th Cir.1991)). That is a substantially higher standard of review than that which we apply to direct review of properly preserved evidentiary errors. Finally, the majority opinion concludes that the officer's opinions and accusations were necessary to place Appellant's answers in "context." As the following transcript of the final eighteen minutes and thirty seconds of the audiotape shows, that portion of the interrogation consisted almost entirely of Detective Stephens haranguing Appellant with his opinions and accusations and Appellant's denials of the same. Appellant's answers were almost always a simple "yes" or "no," or "uh-huh" or "uh-uh;" thus, there were no meaningful answers to place in "context."

Q: Phillip, I'm going to tell you something. *Have you ever heard an old statement that the truth will set you free? You better start telling the truth* because you're in big trouble. I know that you've been beat up. I can tell that by looking at your body. Don't look at me like you're surprised. I know that we had police officers here yesterday and you wouldn't let them talk to your wife. You all was fighting and you said something about if anybody came in you

would have a shoot-out or something. Nobody wanted to talk. I understand that you all were drunk yesterday, that you all were fighting yesterday, and it got out of hand. Tell me the truth.

A. No (interrupted).

Q. I know there's blood in the washing machine where you've cleaned up. There's blood on the towels in the washing machine. We've seen those. You tried to clean it up. You're going to go the way—you better start helping yourself. The only person that can help you is you. I'm going to listen to you and *you better give me a statement that makes sense. That makes no sense.*

A. I can't (interrupted).

Q. You're going to prison for a long time if you don't start helping yourself. Now, if you were fighting last night and she pushed you and you hit each other, I understand that. You all got in a fight. You'd been drinking all day. You got into a fight. She ain't been dead that long. And you all had been fighting, hadn't you?

A. No.

Q. *Oh, come on now, Phillip, don't give me that.* You all had been fighting. That's why you had to clean the house up, because you had knocked everything around. And you hit her a little too hard and you killed her. And that's exactly what's happened. It don't take no brain scientist. I ain't no brain man. I'm just a poor old man that can look around and see the facts of life. And unless you want to help yourself, Phillip, you're going to go down the road a long time. *Now you better tell me the truth.*

A. I'm telling you all I can remember (interrupted).

Q. *You ain't telling me nothing. You remember every bit of it.* You can remember that you all were drunk and

fighting. Are you telling me you weren't drunk and fighting?

A. No.

Q. Where's your shoes at, Phillip?

A. They're inside.

Q. I bet you they got blood on them, probably. If I go find them, I'm probably going to find her blood on them. Phillip, you're in a big world of trouble.

A. (Unintelligible).

Q. The only way out is to tell the truth.

A. I am.

Q. *No you're not. You're not. You want me to believe that stuff but that ain't the truth.* The truth is that you know that you all got in a fight, that she smacks you, I'd say she put a couple of marks on you. She may have even put that mark on your head. And at that point in time, you defended yourself and you had to hit her. *And you hit her a little too hard. I know what took place. And you do, too.* You're wanting to tell me but you're afraid to.

A. No, sir.

Q. Yes, you are. You might as well start talking, buddy. You're in big trouble and the only way you're going to get out is to tell the truth. The truth will help you; it won't hurt you. *These lies will hurt you.* When I start showing the blood all over the house—there's blood everywhere in that house. All over the doors, in the washing machine, in the bedroom.

A. That's because she fell down a couple of times.

Q. I'm sure she did.

A. Then she used different rags to wipe her face.

Q. Come on. *You better think of something better than that, buddy. A jury ain't gonna buy that.* You're going to the penitentiary for a long time unless

you start talking. You better tell the truth.

A. I am, the best I can remember.

Q. You can't remember nothing, can you?

A. Not much.

Q. Why?

A. I was asleep.

Q. Oh, you'd been drunk. You weren't asleep. You weren't asleep when you hit her, were you? Were you asleep when you hit her?

A. No.

Q. You were awake when you hit her, weren't you?

A. She fell asleep (interrupted).

Q. Okay, come on. *I don't want to hear lies. I want to hear truth. If I'm gonna hear lies, we can just stop talking.* Do you want to help yourself or do you want to go to the penitentiary forever?

A. I want to help myself.

Q Then this is your time. I can either help you, or I can hurt you. Not me. You, yourself. You can help yourself or you can hurt yourself. That's up to you. If you want to tell me the truth, you'll help yourself. If you don't want to tell the truth, then you can go to prison forever. I mean, you'll be gone for a long time, buddy. Murder's a big crime in this county.

A. I didn't (interrupted).

Q. You didn't mean to kill her?

A. I didn't kill her.

Q. *Yes, you did. The facts speak for themselves.* You didn't mean to kill her, I'm sure of that. You all got to fighting. Is that the truth, did you all get to fighting?

A. No.

Q. You don't want to talk anymore. You just want me to write it up that you weren't fighting, you just killed her. Is that how you want me to put it in?

A. No.

Q. It's easy for me. We'll take a statement that you weren't fighting.

A. I was drinking and (interrupted).

Q. Were you fighting? Yes or no?

A. No.

Q. Then you weren't fighting. You just hit her for no reason at all.

A. No.

Q. She wasn't fighting with you. You just murdered her, is that what you're telling me? How'd she die? She's been murdered. Somebody beat her to death. So, evidently, you didn't hit her, she didn't hit you, did she? Did she hit you? Yes or no?

A. No.

Q. *So you just beat the fire out of her, didn't you? You just killed her.* Is that how it is? Somebody killed her. You've got the blood all over you, all over your house, in your washing machine. Do you want me to take you in and let you see the washing machine? Do you want to go in there? Shut the door. I can tell you what's in the washing machine—towels full of blood. You had to put them there. You said you cleaned up. So you knew you'd beat her. Evidently, she didn't beat you because you told me she didn't hit you. I know you're sorry about it and I understand that. *You got drunk and you beat your wife to death.*

A. No, sir.

Q. *Sure you did.* She didn't beat herself to death. Who put her in the bed? *You did after you beat her up—after you'd beat her to death.*

A. I woke up and she was that way.

Q. *You done beat her to death.* And you knew she was dead. You said you

looked in her eyes. You sat there and said, "I looked in her eyes and she was dead, so I put her in bed." You knew you had beat her to death. And you were scared so you cleaned the house up. That's pretty much how it happened, isn't it?

A. No.

Q. Then how did it happen?

A. Be honest with you, everything was a blackout.

Q. You mean you blacked out and beat her to death?

A. No.

Q. Then how'd it happen? How'd she get beat to death? Who cleaned the place up? Why did you clean up all the blood?

A. That's my responsibility.

Q. And you knew you'd beat her to death.

A. No.

Q. You were very sorry that this happened, weren't you?

A. Of course.

Q. You didn't mean to kill her. I don't think you did.

A. I couldn't believe that she froze to death.

Q. Who froze to death?

A. My wife.

Q. She didn't freeze to death. She's been beat to death. There ain't no freezing to it. That house is ninety degrees inside. There ain't no freezing in there. She's been beat to death. That's the only thing that happened. She's been beat to death. And you got drunk and she was drunk and she got beat to death. You all got in a fight. You got in a fight yesterday afternoon. We had troopers here yesterday afternoon. You all were fighting.

A. What happens, I mean, how many years will I get?

Q. I don't know. It's kind of how you help yourself. Right now you're going for the big time. You're not trying to help yourself. *You don't want to tell the truth.*

A. I am telling the truth. To be honest, it's a blur.

Q. *I can't believe that.* It may be a little of a blur but you knew that you all were fighting and you remember you all hitting each other. *You think a jury's going to believe that? Honestly? Is a jury going to believe that you don't remember you all fighting and you beating her? Do you think a jury's going to believe that?* Now we sent the body to autopsy and they're going to come back and tell us how she was beat. Maybe she was shot, I don't know. Did you shoot her? Have you got a gun?

A. Yeah, but it's unloaded.

Q. So you didn't shoot her?

A. No.

Q. So you didn't shoot her?

A. No.

Q. You're sure?

A. I'm positive.

Q. You're positive you didn't shoot her?

A. Yeah. It's not loaded.

Q. So that's not a blur. But all of a sudden it is a blur when you can't remember how you beat her. *That don't make sense.* If I can remember one fact, I can remember another fact. Well, you better help yourself now.

A. I'm telling you all I can remember. Everything's fuzzed up on me.

Q. You can't remember you all fighting?

A. No.

Q. You don't remember you all fighting? You don't remember? When you got up this morning, what kind of clothes did you have on?

A. I don't know.

Q. Did you have these pants on? Now you took a shower, didn't you?

A. Yes.

Q. You washed yourself up, didn't you?

A. Yes.

Q. Because you had blood all over you.

A. Nothing but from handling the rags.

Q. Oh, come on, Phillip. You know you had blood all over you from where *you got in a fight and you beat her up. You killed her* and you passed out. That's pretty much what probably took place. I don't see any marks on you where she hit you. That mark up there, you told me the commode hit you. That was the first thing you told me was that the commode hit you. Now, are you telling me that didn't happen?

A. Uh-uh.

Q. The commode hit you there. So she didn't make that mark on your head, are you telling me?

A. Yeah.

Q. So she made no marks on you. She didn't hit you. *You got mad and beat her up, beat her to death.*

A. No, I (interrupted).

Q. She didn't hit herself. She didn't make those marks on herself. She didn't bust her mouth herself. *You did.* Let me see your hands there. What did you do, use Clorox on your hands to get the blood off of it? You've washed your hands almost (interrupted).

A. No, that's a skin condition.

Q. Let me see your knuckles. Put your knuckles together. Look at the marks on your knuckles. What caused the marks on your knuckles? See the marks? Do you see a mark there? See the marks? See the skin off your knuckles? What caused that? Hitting her?

A. No.

Q. *Yeah. That's what caused it.* Nobody else lives in this house, do they?

A. Uh-uh.

Q. There's only two people in the house. You and her, right?

A. Yes.

Q. You're alive. She's dead. Am I right?

A. Uh-huh.

Q. She's beat to death. Somebody's beat her to death—I guess. I don't know if she's been shot or not. I don't know, but I don't think she's been shot. You picked the body up and put it back on the bed.

A. No, what I (interrupted).

Q. You just told me you did.

A. I picked it up off the floor and put it in the bed.

Q. And I see one mark on you and it's on the forehead on, I guess you say your right side, or your left side. And you tell me that the commode made it. Is that right?

A. Yes.

Q. Tell me about that. How did that commode make that mark?

A. Well, I slipped in the tub and fell forward. I was trying to pries [sic] up the commode.

Q. Okay. Have you got any other marks on you?

A. Uh-uh.

Q. No other place. Any on your chest?

A. Marks?

Q. Yeah. What's that?

A. That's an old knife wound when I was (interrupted).

Q. What about new ones? You got anything?

A. No.

Q. Nothing? You have got some marks on your knuckles, some places on your knuckles, am I right? Am I right?

A. Yeah.

Q, *And I would say they come from hitting her.*

A. Uh-uh.

Q. Well, how did they get there? *Phillip, don't lie to me. Phillip, you're wanting to tell me the truth but you're scared.* Are you scared? What are you scared of? What's gonna happen to you?

A. Uh-huh.

Q. *Well, I can tell you right now that what's gonna happen to you is not good because you're lying. When you lie you always get in more trouble.* I mean, that's just the way life is. Everytime I lie, I get in more trouble.

A. No. I didn't, I didn't.

Q. You didn't what?

A. I didn't murder her.

Q. Who did? There was only the two of you there. She didn't murder herself.

A. She was stone-blind drunk.

Q. She may be, but you didn't have to beat her to death. *You whipped her, you beat her, and she died from the beating.* That's what the autopsy's going to show. The autopsy's going to show that you beat her and she died. All that blood in that house. Come on now. That's why you had to clean it up. You cleaned it up this morning where she was laying, where you found her.

A. No, sir.

Q. We're going tear that house apart. We're going to get everything. We're going to find blood on your clothes, probably. We know we found blood in the washing machine where you put stuff down in the washing machine to be washed. We know we found blood on the doors. There's blood in the bedroom. There's blood all over that house. And she's been beat to death. Now what's it look like? *Don't take a mountain scientist, brain scientist, to figure out that somebody's not telling the truth here, does it?* I mean I come in and look around and can see pretty much what happened. I'm trying to give you a chance to tell your side. If there was a fight, if she did anything to provoke you, I just want to hear it. If she didn't do anything to provoke you, if there was no fight, and you didn't beat the tar out of her, so be it. What was it? Did she ever hit you?

A. No.

Q. She never hit you. You just hit her.

A. No.

Q. You wanted to say "Yes" that time. You stood there and shook your head "Yes." *You're wanting to tell me the truth, but you're scared to tell me the truth.* I understand this is bad times; but let me tell you, this is your only time. This ball game comes around one time. You better speak now. We're going to the grand jury. You don't want to be locked up for a murder one. If there's any circumstances of why you beat her up, we need to know it.

A. No. Everything's sort of blurred.

Q. You all were just "hunky-dory." Just good buds, huh? You hadn't been fighting. You didn't fight yesterday afternoon.

A. Uh-uh.

Q. You didn't fight last night. Did you?

A. Uh-uh.

Q. Did you fight this morning (interrupted).

A. No.

Q. When you got up? You just beat the tar out of her (unintelligible)?

A. Uh-uh.

Q. *I know you did.*

A. Uh-uh.

Q. Why did you shake your head "yes"? Now who beat her up? Did she beat herself up? Did she hit herself in the mouth? Is that what she did? Did she beat herself up and kill herself?

A. No. She kept getting up and trying to walk and (interrupted).

Q. You were fighting and that's why you had to clean the house up. That place was probably tore all to pieces where you all were fighting.

A. I swear.

Q. There's not a mark on you except that one on your head and your knuckles. That's all the marks I've seen. And I understand the marks on your knuckles. I don't understand the one on the head. It looks pretty fresh, but I don't know when you hit the commode. You said she didn't do it. So if she didn't do it and she didn't make any marks on you, *then you just did them to her, I guess.*

A. No.

Q. Phillip, okay.

A. I really can't remember it.

Q. I'm going to put you in a car back here and let you sit. Maybe you'll think in a few minutes. I'm going to stop the tape. It's now about twenty-five minutes after seven. Okay.

(Emphasis added.)

Even if there might be an occasion when an interrogating officer's opinion that the defendant is guilty, is lying, or that the jury will not believe him is necessary to put the defendant's answers "in context," such was obviously not the case here. The opinions expressed by Stephens, coming from a respected officer of the law, were clearly prejudicial and constituted reversible error.

## II. DIARY.

During the trial, numerous entries from the victim's diary were cumulatively introduced into evidence as Commonwealth's Exhibit 19. Most of those entries characterized Appellant as a lazy, drug-addicted, unemployed person who used his wife's earnings to support himself and his drug habit. Other portions of the diary were not admitted. The entries presented to the jury were as follows:

> *January 10, 2001—Wednesday*
>
> Every day I'm reminded again of how much of a slug I'm married to.... He [is] simply a drug addicted bum.
>
> *January 23, 2001—Tuesday*
>
> Maybe he'll fall dead today. I hope so. I *HATE* him passionately.
>
> *January 24, 2001*
>
> He'll expect me somehow to afford to buy him 15 more tomorrow plus pot [presumably referring to marijuana]. He's the most inconsiderate son-of-a-bitch I've ever encountered. Of course, if I don't buy what he wants he'll pout all weekend.
>
> *January 25, 2001*
>
> The bum is still laying in there asleep. He's mad because I don't make enough money to keep *him* up—with dope & all.
>
> *January 31, 2001*
>
> He blackmails me. Says he'll make me lose my house & my job. It scares me so I do what he wants.
>
> *February 7, 2001*
>
> He doesn't have anything to do, no license, no job, no pot. That's the kicker—no pot. When he has pot he's happy, if not he's depressed. We'll

probably end up in a fight tonight cause he blames me for all his woes.

*February 9, 2001—Friday*

It's the one variable that changes & can change my life. Problem is—I can't afford $150 pot a week. Phillip would rather sleep for 6 months than to get a job so no help there. Phillip is a giant leach [sic]—slowly sucking the life out of me. I have to get rid of him some way. But 1st I have to get off the V's [presumably referring to Valium]. That's how he's holding me.

*February 9, 2001—Friday night*

Without pot, he's a horrid little man. It lets his real personality *shine* through . . . a nasty, horrid little man. He won't work, he won't act like a human being w/o pot. God Help Me. I've got to detox quick & get rid of him.

*February 10, 2001—Saturday*

I dread today. We have no pot so Phillip will either hide in his bedroom all weekend or come stomping out with that mean, disgusting look on his face. He's gonna run out of V's & so am I. I'm preparing to go to St. Joe to get detoxed. I don't really give a damn what he does. He thinks he's entitled to be high all the time. He can't <f> without being high. I HAVE TO GET RID of him even if it means losing my house. W/o him I can buy another house. He'll try to fight w/me today but God help me keep my cool. There's no need arguing with an idiot.

*February 22, 2001—Thursday*

Now I see what that piece of s— does all day—he sleeps. He accomplishes nothing. He's not worth the 10 cents for a bullet to blow his brains out. I WISH HE WOULD DIE.

*March 4, 2001*

He can't seem to stand the girls [apparently referring to grandchildren] anymore. He wants to cut back the x's I see them . . . . I gotta *do* something.

*March 6, 2001*

We only have 80 V's left to last a month & 1/2. I'm going to just stop taking them & see what happens. I hope I die. I'd rather be dead & gone than live with that SOB another day. I hate him. I despise him. I hope *he* dies.

*March 12, 2001*

Bad days are coming. We have 40 V's. We have 37 days left. I'm going to go into withdrawal & so will Phillip. We're in trouble. Tommy the great can't or won't get any. We're just screwed. If I'm careful I'll have about 25 days to work. Then—I don't know.

*March 12, 2001*

I HATE HIS GUTS. As soon as I get off these V's—good buy [sic].

*March 18, 2001*

Another day, another fight.

*March 20, 2001—Tuesday*

I have to take the slug up to Tokiko to get a $50 check. That means I'm late for work. Phillip thinks every *little* thing he wants should be granted immediately. I really hate him . . . . He's a horrid person. I wish that he would FALL DEAD.

*April 11, 2001*

I'm going crazy, can't sleep. He's driving me insane. I WISH HE WOULD FALL DEAD!

*April 16, 2001*

He's just a big fat piece of s— that *won't* work. I HATE HIM. DEAR GOD let him FALL DEAD!

*April 28, 2001—Saturday*

I can't support his habit much longer. I'm going to quit everything. That way he won't have anything to blackmail me with. I hate Him. I wish he would FALL DEAD.

*May 27, 2001*

I still wish that SOB would die. He's out in the car now. I hope he gets caught & put in jail for 20 years. God only knows how much I HATE HIM.

*May 28, 2001—Memorial Day*

Phillip wants to buy $50.00 of pot A DAY. I just can't swing it, don't know what to do. He thinks the inheritance he's gonna get from his grandpa is gonna make up for 3 yrs of not working. I'll be surprised if we get $1000.00.

*June 9, 2001*

I pray to God that son of a bitch will die. Just fall dead. I hate him with every fiber of my being. He's a pathetic leech. He's already drained me dry. I'm in so much debt I'll never pay it off because HE wants dope . . . he's still pouting this morning. Maybe he'll pout himself to death. I hope so. Maybe he'll get hit by lightening [sic]—I hope so. I just wish he'd disappear from my life.

*June 21, 2001—Thursday*

He just "can't deal" with anything. A weak, pathetic human being. God let him fall dead!

*June 28, 2001—Thursday*

Phillip is . . . guess where—in bed. . . . The real reason he's in bed is because I won't buy pot *again* today. He wants a $25 bag everyday. As of now I am no longer a pot smoker. But that won't help. He will still smoke $25 a day. But he wouldn't work for anything. He just won't work but expects anything he wants. I wish he would FALL Dead. It's like he blames *me* because we don't have enough money to buy a bag a day. I think I hold up my part of this deal. I pay every bill, buy every bite of food, and *all* the pot I can. But simple addition & subtraction should be enough proof that we just don't have the money to buy a bag every day. Then he starts eating nerve pills to keep himself zoned out or asleep cause he'd rather be asleep if he's not stoned.

*July 10, 2001*

He says soon as he gets his money from his Papaw he's leaving. He promised me he'd pay all the credit card bills I ran up since he's not worked in 2 yr. & smoked pot every day. Loser.

*July 19, 2001*

There's no getting around it. Phillip's a big fat loser. He can't make a living. He does nothing but mow the yard, yet he wants $25 worth of dope a day. He's always cold like a Pussy. Won't let me turn the air conditioner on. I HATE HIM.

*July 23, 2001*

Well today's the day we're supposed to start painting the l. room & guess who's still in bed. You guessed it . . . the big lazy loser. He'll probably stay in bed until 10:00 & hope I'll say it's too late to start. But I won't. He's a big, pussy, lazy, loser. He's completely worthless.

*August 7, 2001*

Still things are OK. I've still got a few hundred dollars. But that will be gone this week & I don't get paid till the 20th. Even after that there's no money . . . it's all owed in bills. That's when the fighting will start again.

*August 13, 2001*

My life is out of control. I feel like I'm losing it . . . fighting with Phillip about money all the time . . . . I really don't feel like I can hold it together at work tomorrow. I think the end is near.

*August 14, 2001*

Even the $ mom sends me he wants. But *work!* NO WAY. He would sit & starve to death rather than work. I wish someone had warned me about men who look for mothers. . . . If I could get away from the nerve pills I could escape

this situation. I wish I'd never heard of or seen Phillip Lanham.

*August 15, 2001*

Phillip is a leech. He preys off stupid people like me. I pray to God I can get off these V's so I can Kick His Ass out. He's worthless as a pile of s—.

*August 21, 2001*

Phillip & I will never have anything—God will make sure of that. Both Phillip & I are addicts & we will never have but the bare minimum. I can forget about new furniture, cologne, anything extra. As for the so called inheritance, I would bet my *life* that will not come to be. We will etch along, scraping & doing without until we die. So much fun.

*September 1, 2001—Saturday*

We're living on credit & I'm going crazy. Phillip will never bring in another cent the rest of his pathetic life. All he does is take, TAKE TAKE. I know I'd be better off w/o him. Wish I could get rid of him. He's pathetic.

The Commonwealth gave pretrial notice pursuant to KRE 404(c) of its intent to introduce: (1) the diary entries; (2) evidence that the police had been called to the residence within days of the murder, responding to the victim's calls that Appellant was trying to put her out of the house; (3) that police performed a "welfare check" on the victim in response to her family's claims that Appellant would not let her out of the house; and (4) that on September 27, 1993, eight years prior to the victim's death, Appellant was charged, but not convicted, of assault in the fourth degree based on an allegation that he had "slammed the victim's head," causing a knot on her head, during a domestic disturbance.

During an *in limine* hearing held on these issues on January 28, 2003, defense counsel (1) objected to the diary entries except those in which the victim admitted she was addicted to Valium, which tended to support Appellant's theory that the victim fell and killed herself while intoxicated by drugs and alcohol; (2) agreed to the admission of the evidence of the incident that occurred within days of the victim's death; (3) denied any knowledge of the "welfare check" incident; and (4) objected to any evidence pertaining to the eight-year-old assault charge. Following the hearing, the trial court entered a handwritten order holding the diary entries "admissible in that they are offered to prove the state of mind of the victim," then noting that the parties were negotiating over which entries would be used and that "[d]efense may renew objections on portions not agreed." The court did not rule on the admissibility of the other three incidents, and their only relevance to this appeal is to identify which evidence in the KRE 404(c) notice defense counsel agreed to admit and which evidence she did not agree to admit. Specifically, she did not agree to the admission of all of the proffered diary entries.

The diary entries, along with other evidence issues, were again discussed during a lengthy *in limine* hearing on the morning of trial. The majority opinion interprets statements made by defense counsel during this hearing as an agreement to the admission of all of the entries that were introduced into evidence, except the entries dated March 4, 2001, and May 27, 2001. However, the accurate interpretation of these events is that the trial court ruled on January 28, 2003, that all the diary entries were admissible under the state-of-mind exception to the hearsay rule, KRE 803(3), and that the parties then attempted to agree on which entries would be introduced in accordance with that ruling. Because the parties could not agree on the introduction of the entries dated March 4 and May 27, 2001, defense

counsel renewed her objection to those entries. Thus viewed, defense counsel's objections on the morning of trial to specific entries did not waive her previous objection to the admission of the other entries.

Statements relating to the declarant's present emotional state, *e.g.*, fear, sorrow, excitement, fall within the so-called "state-of-mind" exception to the hearsay rule, KRE 803(3). *Ernst v. Commonwealth*, 160 S.W.3d 744, 753 (Ky.2005); *Bray v. Commonwealth*, 68 S.W.3d 375, 381 (Ky.2002); *Partin v. Commonwealth*, 918 S.W.2d 219, 222 (Ky.1996). However, such evidence is only admissible if the declarant's state of mind is relevant. *Ernst*, 160 S.W.3d at 753–54; *Blair v. Commonwealth*, 144 S.W.3d 801, 805 (Ky.2004); *Bray*, 68 S.W.3d at 381; *Partin*, 918 S.W.2d at 222. Since Appellant did not claim self-defense, the declarant's feelings of hatred and disgust toward him were irrelevant. *Bray*, 68 S.W.3d at 381–82; *Partin*, 918 S.W.2d at 222. In fact, most of the diary entries consist only of inadmissible evidence of Appellant's bad character. KRE 404(a); *Jarvis v. Commonwealth*, 960 S.W.2d 466, 471 (Ky.1998) (evidence used only to paint defendant in a bad light should have been excluded); *Chumbler v. Commonwealth*, 905 S.W.2d 488, 494 (Ky.1995).

Hearsay statements pertaining to specific events, as opposed to emotions, are also admitted under KRE 803(3), but only if they relate to the declarant's future intentions, not to events that have already occurred. *Ernst*, 160 S.W.3d at 753; *Blair*, 144 S.W.3d at 805; *Crowe v. Commonwealth*, 38 S.W.3d 379, 383 (Ky.2001); *Moseley v. Commonwealth*, 960 S.W.2d 460, 462 (Ky.1997).

The only diary entries admissible under these legal principles were those dated February 7, 2001 ("We'll probably end up in a fight tonight cause he blames me for all his woes."); February 10, 2001 ("I dread today. We have no pot so Phillip will either hide in his bedroom all weekend or come stomping out with that mean, disgusting look on his face.... He'll try to fight w/me today but God help me keep my cool."); and August 7, 2001 ("Still things are OK. I've still got a few hundred dollars. But that will be gone this week & I don't get paid till the 20th. Even after that there's no money ... its all owed in bills. That's when the fighting will start again."). These are the only entries that relate to future events and tend to prove Appellant's motive to kill the declarant.

For these reasons, I respectfully dissent and would reverse Appellant's convictions and sentences and remand this case to the Garrard Circuit Court for a new trial.

LAMBERT, C.J.; and SCOTT, J., join this dissenting opinion.